SIMPSON *v.* PRUDENTIAL INSURANCE COM-
PANY OF AMERICA

[No. 103, September Term, 1961.]

394

*Decided  January 24, 1962.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and SYBERT, JJ.

*Ronald A. Willoner,* with whom were *Keane & DePaul* on the brief, for the appellant.

*Howard H. Conaway,* with whom were *Shale D. Stiller, Hal C. B. Clagett* and *Frank, Bernstein, Gutberlet & Conaway* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The plaintiff-appellant, Mrs. Simpson, brought this suit against the defendant-appellee insurance company, Prudential, claiming as the beneficiary of a policy of insurance on the life of her husband, which, she avers, the defendant had contracted to issue. The husband was killed in a motor vehicle accident while his application was pending. The principal question presented is the construction of the husband's application for insurance and of a "conditional receipt" issued by the insurance company upon payment of the first annual premium. At the conclusion of the plaintiff's case the trial court granted the defendant's motion for a directed verdict. The plaintiff appeals from the judgment for the defendant entered thereon.

The material facts as shown by the plaintiff's evidence are substantially as set forth below. The plaintiff and her husband bought a new house at Brentwood, Maryland, in the summer of 1958. At the solicitation of an agent for the insurance company, who pointed out the hazardous nature of the husband's occupation as a truck driver and the wife's need for protection if anything should happen to him, they decided to take out a policy of insurance on the life of the husband to cover the amount of their mortgage, which was then about $12,000. The basic policy was to be for $3,000 with additional, but diminishing term insurance, initially in the amount of $10,000. The

husband executed Part 1 of the application for insurance (the non-medical part) on August 23, 1958, when the insurance agent visited the Simpsons in their home. The agent inquired whether the husband wished to pay the premiums on an annual, semi-annual or quarterly basis, and the husband asked if the agent didn't want to wait until after the medical examination. The agent replied: "No. When you give me the check for a payment on this insurance, you are covered. When I receive your check, you are covered as of then." Mrs. Simpson then drew a check payable to Prudential for $167.69, the amount of the first annual premium of the policy applied for. This check was cashed by Prudential on the next day. On August 31, 1958, a physician selected by the insurance company came to the Simpsons' house, gave Mr. Simpson a physical examination and completed Part 2 of the application, which Mr. Simpson signed. The results of the medical examination were apparently satisfactory in all respects but one. That one, as reported by the examining physician, was a "trace" of sugar in the urine. The application form required, in such a case, that a portion of the urine examined be forwarded to the home office of the company.[1] On September 8, 1958, Mr. Simpson was killed in a tractor-trailer accident. On September 19, 1958, a representative of the insurance company visited the plaintiff, offered her a refund of the premium paid, told her that her husband had not passed the physical examination and denied any liability except for return of the premium. At this time the insurance company knew of the death of her husband and no policy on his life was ever issued.

In Part 1 of the application, the husband specified the

---

1. Documents submitted by the insurance company in opposition to the plaintiff's motion for summary judgment (which was not granted) indicate that this was done and that the analysis showed .16% of glucose, and that the company on September 3, 1958, requested the examining physician to complete a glucose tolerance test on the applicant and notified its agency that such a test would be required before the risk could be evaluated and asked the agency to contact the applicant to arrange for such a test. These documents, though copies are included in the record, were not offered in evidence at the trial, at which the defendant offered no evidence.

kinds and amounts of insurance applied for, named his wife (the plaintiff) as beneficiary, and agreed (among other things) to these provisions: "(2) that no agent has the authority * * * to modify the application, or to bind the Company by making any promise or representation or by giving or receiving any information;" and "(3) that except as may be otherwise provided in the Conditional Receipt Form * * * [issued] for an amount * * * equal to the first full premium on the policy applied for, no insurance shall take effect unless a policy is issued by the Company and delivered to and accepted by the proposed insured * * *."

The Conditional Receipt Form did otherwise provide. It is headed in capitals "THE PRUDENTIAL INSURANCE COMPANY OF AMERICA" and in larger capitals "CONDITIONAL RECEIPT". It is dated August 23, 1958. It acknowledges receipt from the husband of $167.69 "being payment on account of a policy applied for on the life of Homer E. Simpson (Proposed Insured) in THE PRUDENTIAL INSURANCE COMPANY OF AMERICA." Then follow four unnumbered and unlettered paragraphs, which (for convenience) we designate as A, B, C and D, respectively. Paragraph A, after reciting certain conditions which were clearly met, continues as follows:

> "and if the required and completed Part 1 and the required and completed Part 2 of the application and such other information as may be required by the Company are received by the Company at one of its Home Offices and if the Company after the receipt thereof determines to its satisfaction that the proposed insured was insurable on the later of the dates of said Parts 1 and 2 on the plan, for the amounts, for the benefits and at the premium rate applied for, the insurance in accordance with and subject to the terms and conditions of the policy applied for shall take effect as of the later of the dates of the required and completed Parts 1 and 2 * * *."

Paragraph B provides for the refund of the premium if

insurance does not take effect in accordance with Paragraph A, unless the Company issues a policy and the proposed insured accepts it, and further provides that any delay in refunding the amount paid "before or after the demise of the proposed insured shall not be construed to create a contract of insurance or any liability on the Company, except for a return of the above payment."

Paragraph C is almost a verbatim repetition of agreement (3) quoted from the application. It negatives the power of any agent to modify any application or to bind the Company by making any promise or representation or by giving or receiving any information.

Paragraph D states that the "receipt is issued on the condition that any check * * * be good and collectable."

The receipt is signed at the foot by the soliciting agent as "Agent," and the agency is identified as "Wash. D. C." Opposite the signatures is a note requesting that unless the "proposed owner" receives a policy within six weeks, notice be given to "The Prudential Insurance Company of America, giving the amount paid, date of payment, and name of person to whom paid." The trial judge held that there was no contract of insurance. He granted the defendant's motion for a directed verdict on the basis of instructions requested by the defendant that (i) there was no legally sufficient evidence to entitle the plaintiff to recover, and (ii) the uncontradicted evidence showed that there was no contract of insurance between the plaintiff's husband and the insurance company. The trial judge's comments to the jury indicate that the motion was granted because of the lack of power of the soliciting agent under the terms of the application and of the receipt to bind the insurance company by his statement as to coverage and because "as a matter of law there was not a binding contract of insurance that existed between the deceased and the insurance company."

We agree with the learned trial judge that the agent lacked authority to bind the Company by the statement as to immediate coverage attributed to him by the plaintiff.[2] The ab-

---

2. Under Code (1957), Art. 48A, § 111, misrepresentation is a ground for the revocation or suspension of an insurance agent's license.

sence of such power was clearly set forth not only in the application, but in the receipt itself, upon which the plaintiff's claim must stand or fall. These clauses, we think, are effective and binding. *Eureka-Maryland Assurance Corp. v. Samuel,* 191 Md. 603, 613, 62 A. 2d 622; *Lycoming Fire Ins. Co. v. Langley,* 62 Md. 196, 208-211.

On the other hand, the receipt itself clearly undertakes to express some obligations of the insurance company itself. The form is furnished by the company to serve its own purpose of collecting the premium in advance, and the check in payment of the premium (drawn by the plaintiff) was payable to the order of the insurance company and was deposited in its bank account and duly collected. We do not understand that Prudential contests the authority of the soliciting agent to sign and issue this receipt on its behalf and so to bind it by any obligations therein stated. The crux of the case, we think, is whether the terms of the receipt obligated the defendant insurance company to insure the life of the plaintiff's husband at the time of his death.

Interim or conditional receipts or what are sometimes spoken of as "binders" or "binder receipts" or even as "binding receipts" in connection with life and health insurance policies have given rise to a great amount of litigation. Such terms as "binders," etc., seem to have been taken over from the fire insurance industry where the connotation of a binding agreement affording immediate coverage is usually (if not invariably) quite appropriate to such receipts. There they do normally evidence immediate, temporary insurance. *Mutual Fire Ins. Co. of Montgomery Co. v. Goldstein,* 119 Md. 83, 86 A. 35; 29 Am. Jur., Insurance, § 205, p. 596. It is true that the fire insurance company (ordinarily at least) has the right to reject the application, and that it has the further protection under such a policy as the New York Standard Fire Insurance Policy (which is in very wide use) to cancel the policy, even after it has been issued, on relatively short notice to the insured. The life insurance industry has adopted forms of interim receipts, variously designated and differing considerably amongst themselves (Carnahan, *Conflict of Laws and Life Insurance Contracts,* § 36, 220-221, nn. 34 and 35 (2 ed.

1958), collects many forms), at least many of which do not afford immediate, unconditional temporary insurance. Such receipts are, however, designed to commit the would-be insured so that if the company is willing to issue the policy for which he has applied, he cannot withdraw. This result may perhaps be a matter of practical effect and not of legal obligation.[3] The company seeks to protect itself against loss through underwriting and medical expenses in cases where the applicant might have a change of mind before the issuance and acceptance of the policy. Generally, under a life insurance policy, the issuing company has no such broad right of cancellation after the policy is once issued as a fire insurance company has; and a life insurance company obviously has a sound business reason for wishing to be cautious before it fully commits itself by actually issuing a policy which is not readily cancellable. Whether its position differs substantially from that of a fire insurance company with regard to merely temporary insurance, may be open to debate.

However that may be, there are (as we have said) many forms of interim receipts issued by life insurance companies which do not afford immediate, unconditional, temporary insurance. The form here involved is one of them. A glib and sweeping interpretation of the effect of a receipt of this kind such as is ascribed to the insurance company's soliciting agent here, appears to be by no means novel in the litigated cases. See Comment, *Life Insurance Receipts: The Mystery of the Non-Binding Binder,* 63 Yale L. J. 523, 524. These receipts may easily seem to the would-be insured to afford a greater protection than a close analysis of their literal terms might support. It is said in a note on *Gaunt v. John Hancock Mutual Life Ins. Co.,* 160 F. 2d 599 (C. C. A. 2nd, 1947), cert. denied 331 U. S. 849, and on *Leube v. Prudential Ins. Co.,* 72 N. E. 2d 76 (Ohio, 1947), in 60 Harv. L. Rev. 1164, at 1166: "* * * in all probability, unless a formula is adopted of insuring the applicant as of the date of the receipt if he is then a satisfactory insurable risk, the binding receipt will be

---

**3.** See Comment, *Life Insurance Receipts: The Mystery of the Non-Binding Binder,* 63 Yale L. J. 523, n. 6.

increasingly regarded as either an ineffective vehicle for carrying out intention or, at worst, an instrument for deception. See *Starr v. Mutual Life Ins. Co.*, 41 Wash. 228, 232, 83 Pac. 116, 117 (1905). Failure to extend to life insurance the traditional instantaneous coverage long afforded by fire insurance may indicate an unresponsiveness to the type of service the public requires." This last observation is doubtless a sound social or economic comment, but it does not of itself solve the legal problem of interpretating a particular form of premium receipt, nor (as we read it) does it purport to do so.

The effect of so-called "conditional" or "binding" receipts for payment of the first premium on policies of life insurance has been widely litigated. See, for example, cases cited in Annotation. 2 A.L.R. 2d 943. The cases have produced conflicting results and a substantial amount of commentary by text and law review writers. See Vance, *Insurance* (3rd ed. 1951), § 40, pp. 239-41; Carnahan, *Conflict of Laws and Life Insurance Contracts*, § 36 (2 ed. 1958); Patterson, *Essentials of Insurance Law* (2 ed. 1957), at 100-101, 470; Comment, *Life Insurance Receipts: The Mystery of the Non-Binding Binder*, 63 Yale L. J. 523 (1954); Havighurst, *Life Insurance Binding Receipts*, 33 Ill. L. Rev. 180 (1938); Comment, *Operation of Binding Receipts in Life Insurance*, 44 Yale L. J. 1223 (1935); Note, 15 U. of Chi. L. Rev. 379 (1948); Note, 60 Harv. L. Rev. 1164 (1947); Comment, 7 Stan. L. Rev., 292 (1955). This case, however, is one of first impression in Maryland. Neither party suggests that there is any question with regard to Maryland substantive law being applicable.

Some commentators have classified life insurance advance premium receipts in three general categories: (1) "insurable risk" or "satisfaction" binders in which the document states that the proposed insurance takes effect at the time of payment or of the physical examination, if it later appears that under objective standards of insurability the applicant was insurable at the date in question; (2) "approval" binders in which no insurance comes into effect until the insurance is approved by an authorized official of the company; if it does, however, the effective date is that of the application or the medical examination; and (3) unconditional temporary insur-

ance during the pendency of the application or for a stated period (rarely used in life insurance). See Vance, *op. cit. supra*, § 40; Comment, *supra*, 63 Yale L. J. at 528, text and n. 59.

Cases involving life or disability insurance advance premium receipts may arise in a great variety of factual situations. Among those of rather frequent occurrence in the reported cases are these: (a) cases where the company, in ignorance of the death of the applicant or change in his physical condition after the date of the application or medical examination, approves the application, but, on learning of the new fact, refuses to pay; (b) cases where the company, in ignorance of the death of the applicant or other change in his physical condition, rejects the risk, but offers a counter-proposal; and (c) cases where the applicant dies or suffers other change in his physical condition after the date of the application or medical examination but before the company takes any action on his application, and the company, on learning of his death or other change in condition, refuses to pay.

We think that the receipt in the instant case falls within the "insurable risk" or "satisfaction" type of receipt and that it more nearly approaches the third general factual situation above stated than either of the others. Here the situation appears to have been that the company had not taken definitive action. Acceptance is not shown nor is rejection shown (except post mortem). We shall endeavor to limit our discussion of the principal question accordingly.

Some of the cases which have denied recovery in cases involving receipts have done so on the ground that no contract was formed. See Annotation, *supra*, 2 A.L.R. 2d at 963-67. We do not agree with this view. In our opinion, a contract was entered into. The conditions stated are conditions to the fixing of liability, rather than to the formation of a contract. This is the analysis made in *Reynolds v. Northwestern Mutual Life Ins. Co.*, 189 Ia. 76, 176 N. W. 207, and it seems to us correct. Many cases which have adopted the view that no contract is created involve approval or acceptance clauses rather than satisfaction clauses, and have reached their result on the theory that a contract conditional upon the promisor's

acceptance of the application is illusory and not binding. See Annotation, *supra*, 2 A.L.R. 2d at 964-967.

We find no difficulty in reaching the conclusion that a contract was formed as soon as the applicant (or his wife for him) paid the first premium and the company issued its receipt above referred to. Without attempting to appraise the relative values of the consideration moving from either party to the other, we think that the payment in advance of the premium constituted consideration for whatever obligations the company assumed under the terms of its receipt. Cf. *Mutual Fire Ins. Co. of Montgomery County v. Goldstein, supra;* and see Annotation, *supra*, 2 A.L.R. 2d 943, at 950-951; *Starr v. Mutual Life Ins. Co.,* 41 Wash. 228, 83 P. 116; *Livingston v. American Title & Ins. Co.,* 133 So. 2d 483 (Fla. App.). Coverage from a date earlier than that of the issuance or acceptance of the policy was undoubtedly thought advantageous by the applicant. The apparently slight value to him of any other benefits accruing from an earlier effective date may be of assistance in arriving at the intention of the parties. Early coverage was probably the only advantage of early payment which the applicant even thought of. Cf. *Gaunt v. John Hancock Mutual Life Ins. Co., supra,* 160 F. 2d 599 (C. C. A., 2), cert. denied 331 U. S. 849.

At pages 986-987 of the annotation in 2 A.L.R. 2d, above referred to, there is a discussion of receipts of the satisfaction type under which the insurability of the applicant at a particular date is held controlling. Such receipts are described as more liberal than those requiring approval. The learned author of the annotation then states this rule: "Where a binding receipt is issued to the applicant with a provision that the insurance be binding from the date of the application or the medical examination if the insurance company is satisfied that the applicant was an insurable risk at that time the general rule is that a contract of preliminary insurance is created with the reserved right in the insurer to determine in good faith the applicant's insurability. Hence, if, at the time of the application or medical examination the insured was an insurable risk, the temporary contract is in force." This statement is supported by the cases cited as its authority, which

are: *Fields v. Equitable Life Assur. Soc.* (Mo. App.), 118 S. W. 2d 521; *Wolfskill v. American Union Life Ins. Co.,* 172 S. W. 2d 471 (Mo. App.); *Duncan v. John Hancock Mutual Life Ins. Co.,* 137 Ohio State 441, 31 N. E. 2d 88; *Stonsz v. Equitable Life Assur. Soc.,* 324 Pa. 97, 187 A. 403; *Colorado Life Co. v. Teague,* 117 S. W. 2d 849 (Tex. Civ. App.). See also *Western & Southern Life Ins. Co. v. Lottes,* 116 Ind. App. 559, 64 N. E. 2d 405. There is also some authority to the contrary. See *Maddox v. Life & Casualty Ins. Co. of Tenn.,* 79 Ga. App. 164, 53 S. E. 2d 235, and *Summers v. Prudential Ins. Co. of America,* 337 S. W. 2d 562 (Mo. App.), a case involving the same form of receipt as here and heavily relied upon by the appellee. *Summers* did not cite the *Wolfskill* case.

The plaintiff relies very strongly on *Gaunt v. John Hancock Mutual Life Ins. Co., supra,* and on *Ransom v. The Penn Mutual Life Ins. Co.,* 43 Cal. 2d 420, 274 P. 2d 633. The *Gaunt* case differs from the instant case in that home office medical approval had been given to the application on the day when the insurance company learned that the applicant had been killed. There, as here, the receipt used some language indicating that it was of the satisfaction type and some suggestion of the approval type. The majority opinion by Judge Learned Hand held that there was an ambiguity, resolved it against the insurance company, and held that the applicant was covered from the date of completion of the medical part of the application, notwithstanding the further language calling for approval of the application, thus treating the receipt as of the satisfaction type. The condition expressed in the receipt that the company should be satisfied that the applicant was insurable on the date stated had in fact been met. The court held that not what an underwriter might understand the language to mean, but what it would mean to persons "utterly unacquainted with the niceties of life insurance, who would read it colloquially," (160 F. 2d at 601) would be controlling. We agree with this view, which seems applicable here. Judge Clark, in a concurring opinion, urged that the effect of the "binder" agreement should not turn on a possible finding of ambiguity, but on the inequities which might

result from the nature of the transaction and the relative positions of the parties. See also *Starr v. Mutual Life Ins. Co., supra,* on the matter of inequity.

*Ransom v. Penn Mutual Life Ins. Co., supra,* involved a receipt very similar to the receipt in the instant case. There, as here, the company had requested a further medical examination, but had not received it (or the result thereof) prior to the death of the applicant. The court upheld the claim of the beneficiary on the ground that the receipt created only a condition subsequent and not a condition precedent to the liability of the insurance company, and does not appear to have attached any importance to whether or not the applicant was insurable.

With great respect to the views of the court which decided the *Ransom* case, we think that the question of insurability is of controlling importance in the instant case. Unless the standard of insurability is met, the terms of the receipt before us sets up a bar to recovery by the beneficiary. Judge Hand seems to us to have considered insurability of importance in *Gaunt,* and, as we read his opinion, it turns on the fact that the insured did meet the standard there. Judge Clark would have overridden such a condition to liability on the basis of the relative bargaining position of the parties and the inequity involved.

The particular clause now in question is: "if the Company after the receipt thereof [i.e., of both Parts of the application and such other information as it may require] *shall determine to its satisfaction that the proposed insured was insurable* on [the date of Part 2 of the application] *on the plan, for the amount, for the benefits and at the premium rate applied for,* the insurance * * * shall take effect as of [the date of Part 2 of the application] * * *." (Italics supplied.) Does this set up a subjective or an objective standard of insurability? The receipt does not contain explicit language either way, but the explicit terms as to plan, amount, benefits and premium rates do strongly suggest the existence of some definite, ascertainable standard of insurability. We may also note that to construe the language as conferring on the company the right to reject a risk arbitrarily would in substance

convert what purports to be, and what we think is, a satisfaction type of receipt into an absolute approval type. Under the *Gaunt* case, we do not believe that to be its fair meaning.

We think that the clause means that the applicant must meet an objective standard of insurability, and that this standard is the company's own standard for the plan, the amount and the benefits applied for, and at the rate applied for. Honest satisfaction is the standard usually applied under contracts calling for the satisfaction of a party, in the absence of some clear indication to the contrary. See 5, Williston, *Contracts* (3rd ed.), §§ 675A, 675B; 3A Corbin, *Contracts,* §§ 644, 645; Restatement, *Contracts,* § 265. Somewhat by analogy, we think that in life insurance "satisfaction" premium receipts an objective standard of satisfaction to comply with a condition should be applied, if such would be its fair meaning to an ordinary person not versed in the niceties of life insurance to whom such a receipt might be offered. Cf. the *Gaunt* case and see Comment, *supra,* 44 Yale L. J. at 1227; Carnahan, *op. cit. supra,* at 222. We think that at least an ambiguity is presented and that in accordance with the established rule it should be resolved against the party whose language it is—that is, against the insurance company. *Pennsylvania Thresherman and Farmers' Mutual Casualty Ins. Co. v. Shirer,* 224 Md. 530, 168 A. 2d 525.

The burden is, of course, on the plaintiff to show that the proposed insured met the objective test of insurability. The evidence does not make it clear whether he did or did not do so. The presence of a "trace" of sugar in the urine does not seem conclusive, and it would appear from the application form that the company did not think it so. Evidence of insurability of the applicant according to the general standards of the industry would, we think, be sufficient to establish a *prima facie* case for the plaintiff. This the defendant might rebut by proof of its own objective standard (if different), or by evidence to show that the applicant did not meet this standard (whether the same as the general standard or different from it), or by evidence to support both of these contentions. Cf. *Wolfskill v. American Union Life Ins. Co., supra;* 5 Williston, *op. cit. supra.* § 674; 3A Corbin, *op. cit. supra,* § 749. The

sufficiency of the evidence to warrant the submission of the case to the jury on the question of the applicant's insurability does not "plainly appear by the record to have been tried and decided by the lower court," since the comment of the trial judge indicates that the motion for a directed verdict was granted on other grounds. In these circumstances this particular question is not now properly before us for decision. Maryland Rule 885.

In accordance with the above views the judgment will be reversed and the case remanded for a new trial.

*Judgment reversed and case remanded for a new trial; the costs of this appeal to be paid by the appellee.*