**William A. THORNE, Receiver of Atlas Lumber and Door Company, Inc., Plaintiff,**

v.

**AETNA LIFE INSURANCE COMPANY, Defendant.**

**Civ. No. 3659.**

United States District Court
N. D. Indiana,
South Bend Division.

April 22, 1968.

Milton A. Johnson, of Jones, Obenchain, Johnson, Ford & Pankow, South Bend, Ind., for plaintiff.

Joseph T. Helling, of Crumpacker, May, Levy & Searer, South Bend, Ind., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

### FINDINGS OF FACT

GRANT, Chief Judge.

1. The plaintiff, William A. Thorne, is the duly-qualified receiver of the Atlas Lumber and Door Company, Inc., and was at the time of the commencement of this action a citizen of the State of Indiana.

2. The defendant, Aetna Life Insurance Company, was at the time of the commencement of this action, a corporation incorporated under the laws of the State of Connecticut and had its principal place of business in that State.

3. The amount in controversy exceeds the sum of Ten Thousand ($10,000.00) Dollars, exclusive of interest and cost.

4. At all relevant times, Walter M. Knoop was agency supervisor for the South Bend agency of defendant company.

5. From November 17, 1964, until his death, Robert Glenn Reynolds, a resident of Elkhart, Indiana, was the president and principal stockholder of the Atlas Lumber and Door Company, Inc.

6. On December 10, 1964, in the presence of agent Knoop, Reynolds filled out and signed an application for a policy of life insurance with defendant company on the life of said Reynolds in the amount of One Hundred Thousand Dollars ($100,000.00). The beneficiary was the Atlas Lumber and Door Company, Inc., represented herein by the plaintiff-receiver, William A. Thorne.

Included with the application was an aviation supplement covering the life of Reynolds in the event he died as the result of an airplane crash.

After the application was filled out and signed, Knoop received a check made out by Reynolds to defendant's order in the amount of Eighty-Six and ⁵⁰⁄₁₀₀ Dollars

($86.56), representing the value of the first month's premium under the policy applied for. Said check was subsequently cashed on December 17, 1964, and the proceeds thereof were placed in the "Suspense Account" of the South Bend agency of defendant company.

As a part of the same December 10th transaction, agent Knoop gave Reynolds a form entitled "Binding Receipt for payment to apply on first premium". In pertinent part, said Receipt provided:

> (the insurance) shall be effective from the date of medical examination (being the last examination if more than one is required by the Company), subject to the provisions of the form of policy applied for, provided the Company shall be satisfied that on said date the applicant was insurable as a standard risk in accordance with its rules and practices for said amount on said plan.

7. Reynolds left South Bend, Indiana, by plane on December 23rd, 1964, for a vacation trip to Florida. That plane crashed in Florida, causing the death of Reynolds on January 3rd, 1965.

8. On January 8th, 1965, an agent of defendant forwarded a check in the amount of Three Hundred Twenty-Eight and ⅟₁₀₀ Dollars ($328.01) to Atlas Lumber and Door Company, Inc., made payable to that company. Accompanying said check was a letter stating that, "We are returning herewith payments submitted with applications for insurance on the life of Robert G. Reynolds since no policies were issued and no insurance became effective". The uncashed check and the letter remained in the hands of the receiver herein until January 12th, 1966, at which time the check was deposited by him in the Clerk's office of this Court. At all times there was sufficient money in defendant's account to honor the check. No objection was ever made as to inadequate tender of the premium amount.

9. No written policy of life insurance ever was issued by defendant company to Reynolds.

10. The defendant company has not paid the proceeds of any life insurance to the plaintiff or to any other person on account of the death of Reynolds.

11. Other relevant events and facts surrounding the December 10th, 1964, transaction are found to be as follows:

A. On September 30, 1964, Reynolds applied for a $33,000 decreasing term mortgage insurance policy. A "binding receipt" was issued. A medical examination was set up for Reynolds by an agent for two or three days hence. That appointment was not kept. On October 30th, 1964, and after Reynolds had missed several appointments previously scheduled, he took the examination for the $33,000 policy only after Knoop and Charles Pease, an agent for an independent insurance brokerage company, picked up Reynolds at his office and transported him by automobile to the doctor's office. On one occasion previous to October 30th, Reynolds had been told by Knoop that he had no insurance in full force until an examination was taken. Reynolds' reply was that he was aware of that fact and that he would get in for the physical.

Because of information obtained partially as a result of the October 30th examination and partially from other sources, Reynolds was requested to resubmit to another examination for which it was important that a current home office specimen with specific gravity be obtained. This was to be sent to defendant's home office in order that doctors there might correlate Reynolds' medical condition with the medical requirements for the $33,000 policy. Several appointments were set up for such examination at Reynolds' convenience, and he was repeatedly informed of the necessity that it be taken. Although Reynolds always maintained that he had no objection to taking this or any other examination, all such appointments were broken, with various excuses for so doing being offered. As of January 3rd, 1965, a second medical examination for the

$33,000 policy had not been taken, although Reynolds told Knoop on December 10th that it had been.

B. During the period between October 30th, 1964, and December 10th, 1964, Aetna, as the result of information received from various sources, had become aware that Reynolds' case was "special class, at best". Aetna knew, prior to December 10th, 1964, that Reynolds was a substandard risk, at best.

C. On December 10th, 1964, at the time the application for the $100,000 policy was made, Reynolds was informed that a complete medical examination (which would also have sufficed for the September 30th application which was still pending) was necessary and that an electrocardiogram and chest-x-rays were required for this policy. It would not have been issued without such information. The examination was set up in the presence and with the agreement of Reynolds for the following day. The appointment was not kept. Although Reynolds was again thereafter urged to keep such an appointment, none had been kept at the date of his death.

D. At the same December 10th meeting, Reynolds was informed that he would be, at best, a substandard risk. He was again told that coverage would not be in full force until such time as the necessary medical requirements were met.

E. Reynolds indicated upon the application form for the $100,000 policy that although insurance with "Great West" was then in force, the September 30th application for $33,000 mortgage insurance was still pending".

12. Robert G. Reynolds was a man of considerable business acumen and experience, acquired as the result of extensive executive responsibilities.

13. Defendant did not at any time or in any way prior to January 8th, 1965, indicate that it thought that a $100,000 policy of life insurance on the life of Reynolds was in full force and effect.

It consistently required that the conditions as to the taking of the medical examination and as to insurability be met.

14. As of January 8th, 1965, Aetna had made no determination as to whether or not Reynolds was insurable under any of its conditions, including insurability as a substandard risk, nor could it have made such a determination, since the medical evidence available to it at that time was not sufficient to enable it to make such a determination. The reason for the lack of such evidence was Reynolds' own refusal to cooperate in meeting the appointments for medical examinations set up for him.

15. It is not possible for the Court to determine whether or not Reynolds met minimum standards of insurability for the period December 10, 1964, to January 3, 1965.

16. There were no material omissions made in Reynolds' December 10th, 1964, application with respect to the prior condition of his health.

## II.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C., Section 1332.

2. The plaintiff, William A. Thorne, is the proper party to bring this action.

3. The Atlas Lumber and Door Company, Inc., is the proper beneficiary of any proceeds which might issue under the life insurance policy in issue here.

4. Robert G. Reynolds was not guilty of any fraud or misrepresentation in connection with information supplied by him on the December 10th, 1964, application.

5. Aetna Life Insurance Company was not guilty of any fraud or misrepresentation in connection with the issuance on December 10th, 1964, of the "binding receipt" for the life insurance policy here in issue.

6. Aetna Life Insurance Company did not waive any rights accruing to it by retaining the benefit of the first month's premium tendered to it in connection with

the December 10th, 1964, application. A sufficient tender back of such money was made.

7. There was at no time in full force and effect any contract, whether by operation of waiver of conditions, construction of mutual intent, or by application of a rule of unconscionability, by which defendant, Aetna Life Insurance Company, was obligated to pay the beneficiary, Atlas Lumber and Door Company, Inc., any proceeds from a life insurance policy on account of the death of Robert G. Reynolds.

8. The defendant is not liable to the plaintiff.

## MEMORANDUM

In connection with the Court's seventh conclusion of law, we would add the following comment:

██ The facts underlying that conclusion are not in essential conflict. The language of the so-called binding receipt which forms the nexus of this dispute is clear; Aetna, on its part, agrees to become bound upon the fulfillment of conditions precedent requiring the taking of (the last) medical examination and satisfaction that upon said date the applicant was insurable as a standard risk. It knew, of course, that Reynolds was a "substandard risk, at best", and accordingly waived its right to insist that the applicant be a standard risk. On his part, Reynolds knew that specific medical information was needed in order to evaluate the condition of his health and thence to act on both the $33,000 and $100,000 applications. Through no fault of their own, the Aetna agents were unable to acquire medical evidence sufficient to ascertain whether or not Reynolds would have been insurable even as the least insurable type of substandard risk. As stated, the fault lies with Reynolds for not having kept appointments which would have provided such information.

On these facts, the controlling Indiana case is Western & Southern Life Ins. Co. v. Vale, 213 Ind. 601, 12 N.E.2d 350 (1938). In *Vale,* plaintiff, a fifty-five year old illiterate coal miner, applied for a policy of industrial insurance. The receipt given him, after payment of a first month's premium, stated:

> Provided the insured be in sound health and over six months of age on the date of said application, the company's liability under such policy, if and as issued, shall commence as of the date of said application.

The evidence showed that plaintiff was reasonably insurable and that a company agent had represented to him that the insurance would be in effect from the date the receipt for the first month's premium was issued. In holding for plaintiff, the court not only examined the parties' understanding of the transaction in terms of the particular facts of the case, but went further in an effort to ascertain the fair and reasonable understanding that "an applicant for industrial insurance or any reasonable person" would have when issued a conditionally binding receipt upon payment of a premium.

In determining the actual intent of the two parties involved, *Vale* found significant the fact not only that plaintiff had represented that he was in good health but that this fact was true, the manager of defendant's industrial insurance department testifying that plaintiff was a first-class risk. In addition, it had been represented that insurance would be in effect from the time the premium was paid.

When related to the terms of the conditional receipt there in issue, this evidence probably would have been enough for a finding in favor of plaintiff, but the court went on to make the following comments upon situations involving the payment of premiums and issuance of receipts therefor. It said:

> It would be unconscionable to permit an insurance company, issuing such a receipt, and receiving a premium from an applicant, part of which was to pay for protection under its policy from the date of the application to the date

of acceptance, to say that it had not bound itself to give anything whatever for that portion of the premium; that it deliberately intended to accept the premium for that period, but that it never intended to, and that it had not insured the applicant for that period * * * An applicant for industrial insurance, or any reasonable person, understanding that he was insured but qualifiedly or conditionally, would look to the field covered by the company's inquiries for the material out of which the qualification or condition would arise, and would assume that if the representations he had made, and upon which the company had been willing to become tentatively liable, were true, the company was bound. * * * It cannot be assumed that the applicant knowingly and intentionally paid his money to the company without any consideration, nor can it be assumed, in fairness to the company, that it intended to take the applicant's money without any consideration, and with the intention that he should not be insured upon any conditions for the period between the signing of the application and its acceptance and approval. Since no other reasonable construction is suggested, the agreement must be construed as intending that he be insured for the period if reasonably insurable. That is undoubtedly what the applicant understood and believed he was agreeing to. It would be unconscionable to permit the company to assert that there was a meeting of the minds upon any other basis. (at 354–355).

In comparing the facts of *Vale* with the facts in the case at bar, the first obvious consideration is that the applicant here, Reynolds, was not in any way misled. He knew that a medical examination was necessary in order to provide defendant company with information sufficient to evaluate the application for life insurance. There is not much more Aetna's agents could have done in attempting to obtain Reynolds' cooperation in this regard. Thus, the correlation between the conditions prescribed by the binding receipt and Reynolds' own understanding of them was great. He knew at all times what was supposed to be done. On this issue, the case upon which plaintiff here relies, Prudential Insur. Co. of Amer. v. Lamme, Nev., 425 P.2d 346 (1967) is distinguishable, for *Lamme* specifically found that the conditions contained in the binding receipt could not be understood by the *ordinary* applicant, *absent an explanation of their meaning.*

The remaining question raised by *Vale* in the context of the understanding of the reasonable applicant, then, is whether or not defendant company here should be allowed to insist on the taking of a medical examination (or, "the last one if more than one is required") as a condition precedent to recovery. A corollary question is whether or not the company's satisfaction as to evidence of insurability is operative as a condition precedent.[1]

We think that both of these questions should be answered in the negative. In addition to Indiana's long-standing policies against forfeitures,[2] favoring one who stands in an inferior bargaining position,[3] and construing a printed form most strongly against the one who prepared it,[4] *Vale* evidences a strong determination to give an insurance applicant his *quid pro quo.* If, as the testimony in this case indicates, it is the insurance company's purpose, by securing the payment of a premium, to attempt to minimize the chances of an applicant's changing his mind or applying to another company for insurance during the time his application is pending, then such a per-

---

1. We construe this condition as requiring only that which would satisfy a reasonable man in the company's position. Restatement of Contracts sec. 265 (1932); 5 Williston on Contracts secs. 675A and 675B (3rd ed. 1961).

2. Franklin Life Insur. Co. v. Wallace, 93 Ind. 7 (1883).

3. Curtis v. Corya, 117 Ind.App. 244, 69 N.E.2d 742 (App.Div.1946).

4. Western & Southern Life Ins. Co. v. Vale, supra.

son is entitled to protection during that time. Especially is this true when it is seen that the ultimate purpose of securing the payment of a first month's premium by issuing a "binding receipt", as understood by both the applicant and the company, is to provide coverage in the event that the applicant is found to be insurable in accordance with certain objective standards of the company. Such fact is emphasized in the Aetna Life Career Course, a booklet designed for the use of Aetna agents, which states:

If the applicant pays the initial premium at the time he applies for the insurance and is given a binding receipt, he has made the Company an offer as of the payment date. *The policy is in force as of the premium payment date, provided the applicant is an acceptable risk on the date he makes the payment.* (emphasis supplied).

Once it is determined that the applicant is an acceptable risk, the usual practice is to back-date the policy and make it effective as of the date on which the conditional receipt was issued. Regardless, then, of whether or not any examination is ever taken, if it can be shown that the applicant was insurable, the company should not be heard to say that the failure to take a medical examination (or, consequently, the failure to provide proof of insurability) bars recovery. Such a position would not only defeat the very object for which the parties entered into the conditional relations, but would be, in the words of *Vale,* "[to]

disclaim liability for some arbitrary reason of its own choosing".

We think that to find that insurance is in full force and effect from the time the receipt is issued and the premium paid, if the applicant is found to be insurable in connection with objective company standards, is the only result which does substantial justice both to the applicant and to the company.[5] In addition, we would note that such a result has the additional advantage of fixing a definite time when the policy does or does not take effect, rather than having the insurance company act as the final arbiter in this regard by virtue of its ability to set the date of the first medical examination at will, and then to require such additional examinations as may be "necessary".

When this test is applied to the facts in the case at bar, it should be noticed that the question becomes *not* whether the insurance company did make, or could have made a determination as to insurability (compare the Court's fourteenth finding of fact), but rather whether or not the fact-finder, based on *all* medical evidence adduced at the trial, can make such a determination. Since the Court in this case has before it only that information which Aetna had available to it, we have found that the question of whether or not Reynolds came up to minimum standards of insurability for the period beginning December 10th, 1964, is, as it was for Aetna, incapable of determination, since the medical evidence neces-

5. Similar results have been reached in a number of well-reasoned cases generally following the principles announced in *Vale.* See e. g., New England Mut. Life Ins. Co. of Boston v. Hinkle, 248 F.2d 879 (8th Cir. 1957), writ of cert. dismissed, 358 U.S. 65, 79 S.Ct. 116, 3 L.Ed. 2d 106 (1958); Wright v. Pilot Life Ins. Co., 379 F.2d 409 (4th Cir. 1967); Liberty Nat'l. Life Ins. Co. v. Hamilton, 237 F.2d 235 (6th Cir. 1956); Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599 (2d Cir. 1947); Cliborn v. Lincoln Nat'l. Life Ins. Co., 332 F.2d 645 (10th Cir. 1964); Simpson v. Prudential Ins. Co. of Amer., 227 Md. 393, 177 A.2d

417 (1962); Morgan v. State Farm Life Ins. Co., 240 Or. 113, 400 P.2d 223 (1965); Stronsz v. Equitable Life Ass'n. Soc. of the United States, 324 Pa. 97, 187 A. 403, 107 A.L.R. 178 (1936); Mc-Avoy Vitrified Brick Co. v. North Amer. Life Ass'n. Co., 395 Pa. 75, 149 A.2d 42 (1959); cf. Steelnack v. Knights Life Ins. Co. of Amer., 423 Pa. 205, 223 A.2d 734 (1966). See also Allen v. Metropolitan Life Ins. Co., 83 N.J.Super. 223, 199 A.2d 254 (Super.Ct., App.Div.1964), rev'd., 44 N.J. 294, 208 A.2d 638 (1965); United Founders Life Ins. Co. v. Carey, Tex.Civ.App., 347 S.W.2d 295 (1961), rev'd, Tex., 363 S.W.2d 236 (1962).

sary for making such a finding is wholly lacking due to the failure of Reynolds (and, therefore, of plaintiff herein) to provide the means necessary for obtaining it.