**PURITAN LIFE INSURANCE COMPANY, Appellant,**

v.

**Carolyn S. GUESS, Appellee.**

**No. 3807.**

Supreme Court of Alaska.

July 20, 1979.

---

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Phillip J. Eide; Ely, Guess & Rudd, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR and MATTHEWS, JJ., DIMOND, Senior Justice, and CARLSON, Superior Court Judge.

DIMOND, Senior Justice.

Puritan Life Insurance Company, through its agent William Barnes, had solicited Eugene Guess to purchase an additional life insurance policy during the years 1974 and 1975. Barnes eventually was successful, and on March 10, 1975, Guess met with Barnes and agreed to purchase a $100,000 life insurance policy. Guess signed an application for the insurance and gave Barnes authority to pick up what Barnes referred to as a "deposit" from the bookkeeper of Guess's law firm. The bookkeeper was not available at the time, so Barnes left a reply envelope with another person in the bookkeeper's office. Barnes' instructions were to place a $100 check in the envelope when permission was received from the bookkeeper. The envelope with the $100 check was received by Barnes on March 12, 1975, and on that day, Barnes then mailed to Guess what is referred to in this opinion as a "conditional receipt."

When Barnes met with Guess on March 10, he asked the latter if he could get examined because a medical examination would be required. Guess told Barnes that it would be impossible to take an examination that day because he was leaving for Juneau in the afternoon. While in Juneau, on March 13, 1975, Guess died of a ruptured congenital berry aneurysm.

Puritan refused payment of the proceeds of the life insurance policy. Eugene Guess's widow, Carolyn Guess, brought this action to recover such proceeds. Both parties moved for summary judgment, and the superior court granted judgment in favor of Carolyn Guess. Puritan has appealed.

The controversy between the parties centers largely on an instrument entitled "The Conditional Receipt," which was signed by Barnes and mailed to Guess's Anchorage law office on March 12, the day before Guess died in Juneau. This instrument provides in pertinent part as follows:

### THE CONDITIONAL RECEIPT

#### NO. 1561

This receipt must be detached and delivered to Applicant when payment is made; otherwise it must not be detached.

IN NO EVENT SHALL ANY INSURANCE BE EFFECTIVE FOR ANY PERIOD UNLESS THE PROPOSED INSURED(S) WAS (WERE) INSURABLE AND ACCEPTABLE AS PROVIDED BELOW

Received $ 100 on account of the first premium on the proposed insurance of $ 100,000 on the life (lives) of Eugene Guess (including family members, if any) hereinafter called the proposed insured(s) for which an application bearing the above number is made this day to Puritan Life Insurance Company. This payment is made and accepted subject to the following conditions:

Insurance under the terms of the policy applied for and subject to the limits specified below shall take effect as of the date of the application or the policy date requested in the application, whichever shall be the later, or the last of any medical examinations or tests required under the rules and practices of Puritan Life or the date of this payment, whichever shall be the later, provided on that date the proposed insured(s) in the opinion of Puritan Life's authorized officers at its Home Office was (were) insurable

and acceptable under the rules and practices of Puritan Life as a standard risk for the policy in the amount, on the plan and otherwise exactly as applied for, and provided further that the last of any such medical examinations or tests is completed within 60 days after the date of this receipt; otherwise, there shall be no liability on the part of Puritan Life except to return this payment in the form of Puritan Life's check upon surrender of this receipt.

.    .    .    .    .

Dated at   _Anchorage, Alaska_   on _March   10_   19 75   _/s/   William   A. Barnes_ , Agent or Broker.

Puritan contends that these provisions of the conditional receipt make it clear that no insurance would be in effect until Guess had completed a medical examination and Puritan, thereafter, had decided, on the basis of the results of the medical examination, that Guess was insurable and acceptable as a standard risk. The conclusion from this argument is that since Guess died before taking a medical examination, no insurance was in effect at the time of his death, and therefore Puritan had no obligation to pay any insurance proceeds to Guess's beneficiary, his wife Carolyn Guess.

Puritan's construction of the conditional receipt would require it to be read as specifying four effective dates, each of which would be an alternative to the others, namely: (1) the date of the application, (2) the policy date requested in the application, (3) the date of the last required medical examination, or (4) the date of the payment on account of the first premium which, in the amount of $100, was made the day before Guess died. And since the foregoing is followed by the language "provided on _that date_ [emphasis added] the proposed insured in the opinion of Puritan  .  .  . was insurable and acceptable  .  .  . as a standard risk for the policy  .  .  . applied for," insurance coverage would relate back to the latest of the four possible dates, if the applicant is insurable on that day. This means, according to Puritan, that the latest of the four alternative dates was the

date of the last required medical examination, and since the examination never took place, the insurance did not become effective.

We believe the matter cannot be disposed of so easily. A reading of the conditional receipt indicates not four dates, each of which is an alternative of the other, but rather two sets of dates in each of which there are two alternative dates. Using a numbering system to make this more readily apparent, the conditional receipt provides that insurance shall take effect (1) as of the date of the application or the policy date requested in the application, whichever shall be the later, or (2) as of the last required medical examination or the date of payment on account of the first premium, whichever shall be the later. The receipt does not use the word "latest" as indicating one of four possible alternative dates. Rather, it uses the adverb "later," the comparative of "late," which grammatically is to be used in each of the two instances to refer only to two alternative dates, and not to four. Using correct English, one may not refer to the "later" of four alternative dates, nor to the "latest" of the two.

Under this construction of the receipt, it is not clear as to what the proviso refers to. The language is that "provided on _that date_ the proposed insured  .  .  . was insurable and acceptable." (Emphasis added.) But this proviso follows immediately after the second of the two sets of alternative dates, and thus could be construed as relating only to the latter of the two. Consequently, the words "that date" possibly refer only to the later of the last two alternatives, _i. e.,_ the date of the last required medical examination or the date of the first premium payment of $100.

We have analyzed the language of the conditional receipt in a somewhat painstaking manner in order to ascertain precisely what this instrument means. The meaning is far from clear. Conceivably, the conditional receipt could be read as contemplating that the insurance would take effect, without regard as to the time of the occurrence of the events involved, in either of

two instances: (1) the date of the application, since there was no policy date requested in the application, or (2) the date of the last required medical examination, followed by Puritan's approval of the risk, since Guess did not take a medical examination before he died. As to (2), the alternative to that, *i. e.,* the date of the payment on account of the premium, had already taken place, and could not, therefore, be the "later" of these two alternative dates. In this case under (1), the effective date of the insurance reasonably could be the date of the application, since there was no policy date requested in the application that Guess signed. But under (2), the insurance would not have taken effect at all, because no medical examination had taken place before Guess died.

■■■ What we have here is a contract which is ambiguous. The general rule is that "ambiguities in the meaning of insurance contracts are to be resolved against the drafters of the language, the insurers." [1] Applying that rule to this case, we believe that a fair interpretation of the conditional receipt and a reasonable accommodation of the apparent conflict between the two clauses under the circumstances we have related is this: that on the date the application was signed by Guess, temporary insurance became effective, subject to the right of Puritan to terminate the insurance if Puritan, following a medical examination of Guess, had found him to be an unacceptable risk. As Judge Learned Hand stated in *Gaunt v. John Hancock Mutual Life Insurance Co.,* 160 F.2d 599, 602 (2d Cir. 1947), "[I]nsurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion."

■■■ Even if there were no ambiguity, other factors would lead us to the same result. Our general approach to the interpretation of insurance contracts has been summarized in the case of *Stordahl v. Government Employees Insurance Co.,* 564 P.2d 63 (Alaska 1977). In that case, we stated:

The purpose of contract interpretation is to ascertain and effectuate the reasonable expectations of the parties. We have noted, however, that interpretation of insurance contracts is controlled by somewhat different standards. This is due, in part, to the inequality in bargaining power and to the fact that certainty is required to ascertain rates. An insurance policy may be considered a contract of adhesion, and as such, should be construed to provide the coverage which a layperson would have reasonably expected, given a lay interpretation of the policy language. It is not required that ambiguities be found in the policy language as a condition precedent for such construction.

*Id.* at 65–66 (footnotes omitted).

When Puritan's agent, William Barnes, met with Guess on March 10, 1975, he asked the latter if he could get examined because a short-form paramedical examination would be required. Guess told Barnes that since he was going to Juneau that afternoon, it would be impossible for him to take an examination in the afternoon of that day. Guess then signed the application for life insurance and authorized Barnes to pick up from the bookkeeper of Guess's law firm a deposit on the first premium in the amount of $100. Barnes stated that "no Conditional Receipt was issued at this time because no money had changed hands." Barnes also stated: "At no time did Mr. Guess ever look at the Conditional Receipt, nor was the Conditional Receipt ever discussed with him." Barnes received $100 on the day prior to Guess's death.

Barnes did not tell Guess that the taking and "passing" of a medical examination, followed by approval of Puritan, was a condition precedent to the insurance being placed in effect. And since Guess had not seen the conditional receipt and Barnes did not discuss it with him, Guess could not be said to have been put on notice that Puri-

---

1. *INA Life Ins. Co. v. Brundin,* 533 P.2d 236, 241 (Alaska 1975) (footnote omitted). *Accord,* *Gillespie v. Travelers Ins. Co.,* 486 F.2d 281, 283 (9th Cir. 1973).

tan, under its interpretation of the conditional receipt, would not cause any insurance to be effective until it had approved Guess as a standard insurable risk following the completion of a medical examination. This left Guess in the position of having signed an application for insurance, of having paid $100 on account of the premium due, and of having knowledge that it would be necessary to obtain a medical examination.

In these circumstances, a reasonable person could presume—particularly since a premium payment had been made—that he was at least temporarily insured until such time as he had taken a medical examination and had either been accepted or rejected by the insurer on the basis of the results of the examination.

But there appeared to be two contradictory lines of authority on this point. A view more conservative than the one we adopt is exemplified in *National Life and Accident Insurance Co. v. Blagg*, 438 S.W.2d 905 (Tex.1969). That case dealt with a conditional receipt which provided that life insurance would take effect as of the date of the required medical examination if, on that date, the proposed insured was insurable in the opinion of the officers of the insurance company. The proposed insured had taken the medical examination prior to the time he died of a sudden heart attack. The burden was placed on the beneficiary of the insurance policy to show, if he or she could, that the applicant was, indeed, insurable. Thus, in order to recover on a temporary insurance contract which might be found to exist, the beneficiary was obliged to show, usually to the satisfaction of a jury, that based on the available medical evidence the applicant was insurable on the date of completion of his medical examination.[2]

This view seems to be argued by Puritan in this case, although Puritan expressly states that a remand for determination of insurability should not be made. At oral argument, however, it was Puritan's position that, if the case were remanded for determination of whether Guess was physically insurable at the time he signed the application, there could be no question that he would have been uninsurable. Puritan's reasoning in that whether or not the congenital berry aneurysm would have been discovered during a routine medical examination for life insurance purposes, Guess did in fact have a berry aneurysm and therefore was uninsurable.

Other cases take a more liberal approach to the question of temporary insurance, as we do. For example, in *Meding v. Prudential Insurance Co. of America*, 444 F.Supp. 634 (N.D.Ind.1978), the insured died two days after completing the insurance application and making the premium payment, but before taking a medical examination. The court held that a temporary life insurance contract was created once the insurance company had received consideration by way of the premium payment, and that the contract was effective until the insurer had either rejected the insured during his lifetime, or had accepted him by approving the application. The court found that the requirement of a medical examination was a condition subsequent, rather than a condition precedent, to the effectiveness of the insurance coverage.

In *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978), the Pennsylvania Supreme Court extensively cited cases from other jurisdictions that also hold that a temporary insurance contract is created from the time premiums are paid until the insurer either rejects the applicant due to uninsurability or accepts the applicant and issues a policy. The rationale for this is that the reasonable expectations of the applicant for insurance are to be fulfilled. The court stated that the dynamics of the transaction, rather than the contract

---

**2.** Other cases which take this general approach include: *Scheinman v. Phoenix Mutual Life Ins. Co.*, 409 F.2d 999 (7th Cir. 1969); *Thorne v. Aetna Life Ins. Co.*, 407 F.2d 809 (7th Cir.), *cert. denied*, 396 U.S. 826, 90 S.Ct. 71, 24 L.Ed.2d 77 (1969); *Simpson v. Prudential Ins. Co.*, 227 Md. 393, 177 A.2d 417 (1962); *Life & Cas. Ins. Co. of Tennessee v. Harvison*, 187 So.2d 847 (Miss.1966). *See also* Annot., 2 A.L. R.2d 943 (1948).

language, was to be the determining factor.[3]

■ To sum up our holding in this case, we adopt a general rule of law that a temporary insurance contract is created between the life insurance applicant and the insurer at the time the insurer accepts the application form and the first premium payment. The coverage applies at that time, and extends from the acceptance of the premium deposit until the insurer formally acts on the application. The insurer may avoid such temporary insurance coverage only by including clear and unequivocal language in the conditional receipt indicating its intent to condition its liability upon prior approval of the application and the finding of insurability.

■ Furthermore, we require that the insurer's agent, who negotiates the application, personally draw to the attention of the applicant any limiting conditions.[4] The insurer has the burden of showing that it had taken appropriate steps to inform the applicant for insurance of such conditions, and that the applicant, therefore, could not have had a reasonable expectation that he was immediately protected. Under these standards, which we adopt, that burden has not been met. Puritan is liable to Mrs. Guess for the proceeds of the insurance coverage on her deceased husband's life.

There are valid reasons for the position we adopt as to temporary insurance coverage. They are as follows:

(1) The drafting of the conditional receipt is in the hands of the insurance company. Therefore, it should not be able to rely on ambiguous language which is calculated to induce payment of an advance premium.[5] Rather, the insurer should be required to indicate, clearly and unequivocally, its intention to the applicant.

(2) In the absence of an explanation of the conditional nature of the insurance coverage provided, we believe that the person paying the premium at the time he applies for the insurance has a reasonable expectation of at least temporary insurance. This is particularly true when he receives in return for his premium a conditional receipt which contains language which is susceptible of the interpretation that coverage is to be provided immediately pending acceptance or rejection of the application.

(3) The insurer obtains obvious advantages by receiving payment of the initial premium at the time of the application. Not only does the insurer have the use of the insured's money during this period of investigation, but payment of the premium tends to cause the applicant to believe he is immediately insured and hence reduces the likelihood that he will withdraw his application before the insurance company acts on it. Generally, such an applicant will feel contractually obliged to perform. However, if he should withdraw his application, he is unlikely to resort to a lawsuit to recover the relatively small sum paid—as-

3. *See Powell v. Republic Nat'l Life Ins. Co.*, 337 So.2d 1291 (Ala.1976); *Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975); *Law v. Hawaiian Life Ins. Co.*, 51 Haw. 288, 459 P.2d 195 (1969); *Prudential Life Ins. Co. v. Lamme*, 83 Nev. 146, 425 P.2d 346 (1967); *Blanding v. Southwestern Life Ins. Co.*, 268 S.C. 306, 233 S.E.2d 107 (1977). *Contra, Wolters v. Prudential Ins. Co.*, 296 F.2d 140 (8th Cir. 1961). *See generally* cases cited in 1 R. Anderson, Couch on Insurance §§ 14.42, 14.45 (2d ed. 1959 and Supp.1978), and in Annot., 2 A.L.R.2d 943, 967 (1948) and Later Case Service.

4. William Barnes, Puritan's agent, did not do that in this case. In fact, it appears from a statement made by him that, at least in his thoughts, there was a binding agreement of insurance on Guess's life. In his deposition, Barnes stated that he had asked the person in the bookkeeper's office of Guess's law firm to make out a check to Puritan for $100 "to bind the agreement."

5. As stated in *Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1352 (1978), quoting *Toevs v. Western Farm Bureau Life Ins. Co.*, 94 Idaho 151, 483 P.2d 682, 685 (1971):

"We do not mean to imply affirmative misconduct by the soliciting insurance agent. We suggest only that if nothing is said about the complicated and legalistic phrasing of the receipt, and the agent accepts an application for insurance together with the first premium payment, the applicant has reason to believe that he is insured. Otherwise, he is deceived."

suming the insurer has no automatic duty to refund in such a situation.

(4) If there is no temporary insurance until the company decides the applicant is an insurable risk, the insurer is in effect receiving money for which it provides no coverage if it ultimately rejects the application. On the other hand, if the application is subsequently accepted, the insurance company is able to earn premiums from the earliest possible date. In these circumstances, the insurer would not have dealt honestly with the applicant for insurance.

■ Puritan suggests that, since Guess was a lawyer who perhaps had special knowledge relating to insurance, this would be relevant to a determination of his reasonable expectations as to insurance coverage. There is no showing that Guess had any special expertise in the field of insurance in general, or life insurance in particular. We agree with the California Court of Appeal, which stated in *Koorstad v. Washington National Insurance Co.*, 257 Cal. App.2d 399, 64 Cal.Rptr. 882, 886–87 (1967):

It is not relevant that Koorstad is an attorney since it has not been shown that he occupies a position, relative to the insurance company, superior to that of the ordinary layman who is entitled to protection according to his reasonable understanding.[6]

We conclude that when Guess signed the application and paid the premium, his reasonable expectations could well have been that a policy of temporary life insurance became immediately effective, subject to the right of Puritan to terminate the insurance if it found, following a medical examination, that Guess was not an insurable risk.

■ Based on the recovery by Carolyn Guess of $100,000 on the insurance policy, the superior court, in accordance with the schedule contained in Civil Rule 82(a)(1),[7] awarded her attorney's fees in the amount of $9,861.65. Puritan challenges this award on the ground that, since Carolyn Guess was under no obligation to pay for legal services provided by the law firm of Ely, Guess & Rudd,[8] the court abused its discretion in awarding her any attorney's fees.

The court had before it, when it was considering the matter of attorney's fees, the affidavit of Robert C. Ely, a member of the firm of Ely, Guess & Rudd. Under oath, Mr. Ely stated in part:

3. That shortly after the death of W. Eugene Guess, it was necessary to negotiate with Carolyn Guess as the executrix of his estate, a settlement of W. Eugene Guess' interest in the corporation.

4. That these negotiations were conducted at arm's length and that Carolyn Guess had the benefit of the advice of independent counsel in her negotiations.

5. That as partial consideration for the liquidation and release of her interest in the corporation to which she was entitled as W. Eugene Guess' widow, Ely, Guess & Rudd, Inc. agreed to undertake representation of Carolyn Guess in the case of *Carolyn Guess v. Puritan Life Insurance Company*, the above-referenced action.

6. That the value of the partial consideration referred to in Paragraph 5 above to Ely, Guess & Rudd, Inc. was

---

**6.** Professor Keeton favors application of a rule requiring that "[i]f the enforcement of a policy provision would defeat the reasonable expectations of the great majority of policyholders to whose claim it is relevant, it will not be enforced even against those who know of its restrictive terms." R. Keeton, Basic Text on Insurance Law § 6.3 at 358 (1971).

**7.** Civil Rule 82(a)(1) provides in relevant part:
(a) *Allowance to Prevailing Party as Costs.* (1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such

fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

**8.** This was the law firm of which Guess had been a partner prior to his death.

valued as being well in excess of $10,-000.00.

Mr. Ely's statement has not been disputed by Puritan. Given these facts, it seems apparent that Carolyn Guess had "paid for" the services of Ely, Guess & Rudd, although the payment was not in the more usual form of a check issued in response to a bill.

Since the value of the consideration referred to in paragraph 5 of Mr. Ely's affidavit was "well in excess of $10,000," the award of attorney's fees of $9,861.65 was an amount less than the value of the services rendered. Therefore, the attorney's fees awarded were in keeping with the standards established by this court in *Malvo v. J. C. Penney Co.*, 512 P.2d 575, 588 (Alaska 1973), where we stated that the purpose of Civil Rule 82 is to "partially compensate a prevailing party for the costs and fees incurred where such compensation is justified." In any event, we do not find the award "manifestly unreasonable," and it did not, therefore, amount to an abuse of discretion by the superior court. *See Alaska Placer Co. v. Lee*, 553 P.2d 54, 63 (Alaska 1976).

The judgment is affirmed.

BOOCHEVER and BURKE, JJ., not participating.