## PEOPLES LIFE INSURANCE COMPANY
### *v.* MEDAIRY

[No. 14, September Term, 1969.]

*Decided November 11, 1969.*

535

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SMITH, JJ.

*James McSherry* and *Peyton Paul Phillips*, with whom were *Frederick J. Bower* and *Rosenstock & McSherry* on the brief, for appellant.

*Lloyd A. Dreiling*, with whom were *David D. Patton* and *Edwin F. Nikirk* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal is whether or not the Circuit Court for Frederick County erred in denying the motion of the appellant, Peoples Life Insurance Company, the defendant below (Peoples), to direct a verdict in its favor because the appellee, Jeannette E. Medairy, the plaintiff below, presented no evidence that the proposed insured, Paige T. Medairy, husband of the plaintiff, met any objective standard of insurability, the proposed insured having paid the original premium, received a "satisfaction" receipt but having died the day after the receipt was issued.

The proposed insured on October 11, 1967, made two applications to Peoples for two policies of life insurance, totalling $15,000.00. At the time of completing these applications, a check was given to Peoples in the amount of $25.85, representing the full first premium required under the mode of premium (monthly payment) selected by the applicant for the insurance for which application was made. The agent of Peoples, E. E. Purkey,

had come to the Medairy home, at the suggestion of Mrs. Medairy, the plaintiff, to discuss the acquisition of some additional life insurance, Mr. Medairy having recently changed his employment and not being covered by the group insurance program of his former employer. Mr. Medairy, the proposed insured, filled out Part 1 of the respective applications (one for $10,000.00, the other for $5,000.00 of life insurance), Part 1 being the standard type used in the life insurance business to acquire non-medical information. Upon receiving the check for the original premium, Mr. Purkey then gave Mrs. Medairy — the intended beneficiary if living at Mr. Medairy's death, otherwise to the two daughters of the Medairys— a receipt which provided in relevant part, as follows:

" 'RECEIPT' "

" 'THIS RECEIPT MUST NOT BE DE-TACHED UNLESS THE FULL FIRST PRE-MIUM HAS BEEN DEPOSITED AT THE TIME OF APPLICATION AND IT SHALL OPERATE AS A CONDITIONAL RECEIPT ONLY UNDER THE CONDITIONS HERE-AFTER SET FORTH UNDER PARAGRAPH 'A'.' "

\* \* \*

" 'A. If the above payment is made at the time of signing Part 1 of the application and is equal to the full first premium in accordance with the mode of payment selected and the pub-lished rates of the Company for the form of policy applied for in Question No. 4, and if Part 2 of the application is duly completed (Part 2 shall be deemed to include medical examina-tion if such examination is required by the Company), then the insurance applied for shall be in force as of the date hereof or of Part 2 —Medical Examination, whichever date is the later, *provided that the Company is satisfied that on the later of such dates the applicant is*

*a risk acceptable to the Company under its rules, limits and standards on the plan and for the amount of insurance applied for and at the rate of premium declared paid, such insurance being in accordance with and subject to the terms and conditions of the policy contract applied for and in use by the Company at said date; * * *'* " (Emphasis supplied.)

" 'B. If a policy differing in form, amount, or premium from that applied for is offered, no insurance shall be in force under the application herein referred to unless and until the first premium is paid and a policy actually delivered to and accepted by the applicant during the continued insurability of the applicant as stipulated by the terms of the agreement appearing on the reverse side hereof.' "

"(Reverse)"

" 'A. This application consisting of Part 1 and Part 2 (including a Part 2 medical examination which will be promptly completed if required by the Company) and any policy or policies issued in consequence thereof shall constitute the entire contract of insurance, and the Company shall not be bound in any way by any statements, promises or information made or given by or to any agent or other person at any time unless the same be reduced to writing, submitted to the Company at its Home Office, and made part of such contract. The agent has no authority to waive the answer to any question in the application, to modify the application, or bind the Company by making any promise or representation.' "

Mr. Medairy was examined for Peoples by Dr. McKendree Boyer the evening of October 16, 1967, who filled out Part 2 of the application (Medical Information). The information obtained relevant to this case,

was as follows: Mr. Medairy was 45 years of age, had
a height of five feet, five inches in his shoes and weighed
in his ordinary clothing 170 pounds, with no change of
weight during the past year. His blood pressure read-
ings were done at rest and indicated a pulse rate of 72,
with no irregularities, with a systolic pressure of 140
over a diastolic pressure of 88. The pulse rate returned
to 80 immediately after exercise and was again 72 three
minutes after exercise. In regard to the applicant's
heart, there was no hypertrophy present; and Dr. Boyer
in the blank entitled "Diagnosis of the heart condition"
wrote "Normal heart." Under the heading of "Family
Record," it was stated that both parents lived to the age
of 72, the mother having died of heart disease. A sister
of the applicant died after open heart surgery. Doctor
Boyer completed Part 2, the Medical Information Form,
the same evening of the examination, October 16, put it
in an envelope addressed to Peoples, stamped the enve-
lope and mailed it the next morning at around 9:30
A.M., there being no mail collection or delivery the eve-
ning of October 16.

Mr. Medairy had been previously treated by Dr. Boyer
as a private patient on two occasions, but not in connec-
tion with any difficulty with the patient's heart. The pa-
tient had apparently enjoyed good health throughout his
life. In the afternoon of the following day, October 17,
however, while seated at the telephone, he suffered a
heart attack from which he died. The death certificate,
signed by Dr. John G. Ball, indicated the cause of death
as "Coronary Insufficiency, acute."

The deceased had a $3,000.00 life insurance policy with
Peoples issued in 1950. About two weeks after the de-
cedent's death, Mr. Purkey came to see Mrs. Medairy
with two checks, one for the proceeds for the $3,000.00
policy and one for a return of premium paid on October
11, 1967. He also had a paper to sign. Mrs. Medairy de-
clined to accept the check for the return of premium and
to sign the paper. She demanded the payment of $15,000

from Peoples and after Peoples declined to pay, filed an action in the Circuit Court for Frederick County to recover that sum alleging, *inter alia,* in the declaration filed by her, that her deceased husband had "passed" his medical examination on October 16, and that the plaintiff "contends that at the time of the application for the aforesaid insurance policies the first premium required under the mode of premiums selected by the applicant for the policies was deposited in exchange for a receipt bearing the same date, and that the liability of the Defendant Corporation attached upon the acceptance of the payment aforesaid, and the completion of the medical examination required by the Defendant, absent evidence of fraud, deceit, or concealment on the part of the deceased." After general issue pleas were filed by Peoples, the case came on for trial before Chief Judge Schnauffer and a jury on December 19, 1968.

At the trial, by stipulation between the parties, Part 1 of the two applications, Nos. 54-80-42 and 54-80-43 for $5,000.00 and $10,000 respectively, Part 2 (the Medical Information), the receipt of October 11, the $25.85 first premium check (which had been deposited in the Western Maryland Trust Company of Frederick to the account of Peoples) and the death certificate of October 17, 1967, were introduced into evidence as exhibits for the plaintiff. It was also stipulated that the applications were numbered for convenience only and did not constitute policies.

Dr. Boyer testified for the plaintiff, indicating that he made the examination of October 16 for Peoples and that he had completed Part 2 of the applications. After describing in detail the various entries made by him, he testified over objection that, in his opinion, the applicant "was insurable," but immediately qualified his answer as follows:

> "But I would like to qualify that by saying this, that all an examiner does is to state the facts on the medical examination. Then the insurance company itself, the medical depart-

ment, reviews any abnormal findings and then using their tables, actuarial mortality tables and so on, then they draw their own conclusions."

Later in his testimony, he also stated:

"One point only, that he tended to be overweight. His weight was 170 pounds, and according to the tables that are issued by numerous life insurance companies — I didn't have one from Peoples, but I do have one from a number of other companies—152 pounds would be—so he was approximately 18 pounds overweight. I mentioned that to him that night and since he was one of my patients I suggested he come back and go on a weight-reducing program."

On cross-examination, Dr. Boyer stated that he was employed by Peoples "to collect medical facts" and "not to determine insurability." He stated that he had never done any underwriting and was quite aware that "there is a difference between clinical medicine and insurance medicine."

The second and only other witness for the plaintiff was Mrs. Medairy, herself. She testified that Mr. Purkey came to her home some two weeks after her husband's death and the following occurred:

"Q. [on direct examination] What happened when he came to your house; tell us the details? A. Well, he came in; he brought the check and he had a paper for me to sign.

"Q. The check—that was for the policy that he had some years ago? A. Yes, that was taken out about 1950. And I said—and he had some papers on the table with him—and I said, 'Now this paper I am signing doesn't have anything pertaining to the new policy, does it?' He said 'No.' I said, 'Well, I just won't sign anything yet.' He said this was for the old policy. And he

had a paper on the table in front of him, and I hadn't gotten anything or heard anything on the other insurance, and he had a paper there and he had several names on it — he had my husband's name on it—it had 'Paige Medairy issued'—and I said to Purkey—I said, 'There, it has my husband's name on that, issued,' and he said, 'Yes,' something about 'your husband died, I can't give you—I can't tell you any answers,' or something to that effect; and I kidded him and I told him I didn't want—he had given me the refund check and I told him I wasn't accepting it, that it had on there 'Paige Medairy issued.' So 1 gave him back the premium slip that I had—I mean the check that he gave me.

"Q. Did you ask him about 'issued' — what that 'issued' on the paper meant? A. Well, he said he couldn't—he wasn't—I don't know how he had it—not qualified—but he couldn't tell me anything; in fact he said he didn't know — I mean he couldn't tell—-the agent.

"Q. Did he say anything about a policy of insurance with respect to that 'issued'—the word 'issued'? A. No, that is what I asked him, if it was issued and he said it was, but I mean my husband died in the meantime.

"Q. He said it was issued, but your husband had died in the meantime? A. Yes, but I had never received any other policy.

"Q. Then you say you returned that? A. I gave him—I first told him no, and I mean, you know, I took the check, and the more I thought about it I thought no, I am not going to accept the premium back, and I gave him the check back.

"Q. When you gave him the check back what did he say, if anything? A. I don't remember."
On cross examination, Mrs. Medairy testified:

"Q. Mrs. Medairy, when Mr. Purkey came to see you did he have two checks? A. Two checks.

"Q. You said he gave you a check for the old policy then? A. He brought me my policy that I had, you know, ever since about 1950.

"Q. And he gave you a refund check for the premium which had been— A. Well, I say I think he had it that night. I either got it in the mail from Mr. White the same day, because I gave it back to Purkey.

"Q. But he didn't at any time tell you there was any policy? A. No, he didn't say, but there was a paper; he had a paper with him that I saw my husband's name on it.

"Q. But he never told you there was any policy, is that correct? A. No, the paper was there with his name on it and it said 'issued', and that is when I said something to Purkey about it.

"Q. My question was, did Mr. Purkey ever tell you a policy had been issued? A. Yes, I said to him it said 'issued', and he said yes, but my husband died, he couldn't tell me anything; he said 'I am not authorized to tell you anything,' or something like that, you know, 'to tell you anything'."

The unnegotiated check for the return premium, payable to Mrs. Medairy, is dated November 6.

At the conclusion of the plaintiff's case, Peoples, the defendant, filed a motion for a directed verdict. The trial court reserved its ruling and Peoples then offered four documentary exhibits and the testimony of R. B. Carter, the vice-president of Peoples in charge of new business.

Mr. Carter testified in regard to the underwriting routine of Peoples to ascertain whether the applicant will be issued a standard policy, be rated or declined. Peoples has a number of charts against which to compare the medical information furnished by the examining physi-

cian. These charts have been approved aud adopted by the American Society of Actuaries, a nationally recognized society, and are used by between 500 and 600 life insurance companies. The "Build Chart" is for males Ages 18 and over. It was introduced into evidence and showed the average weight based on height, with a schedule of "overweight debits" used in the rating process. Under this chart, the applicant's average weight was 149 pounds and as he was 21 pounds overweight, he received 10 debits on the chart.

A chart entitled "Blood Pressure Tables—Males" was then considered. This chart, introduced into evidence, was put out by the Lincoln National Life Insurance Company and is in use by between 500 and 600 life insurance companies including Peoples. By this chart, the applicant would receive 25 debits. These debits were increased to 30 because of the two deaths in the applicant's family from heart disease.

Although Peoples knew of the applicant's death, the applications were processed in regular course inasmuch as Peoples had on prior occasions issued a policy even when it knew the applicant had died subsequent to the execution of the application but prior to the issuance of the policy. Mr. Carter stated that of the Peoples' policies, in regard to which it made a final decision, 92% were issued "standard" as applied; "approximately 2% are declined outright, and about 6% are rated." The underwriting data sheets in regard to the two applications were offered into evidence. They both are dated October 26, 1967, show 10 debits for "Build," 30 debits (raised from 25 to 30 as already stated) for Blood Pressure. They also indicate that the "waiver of premium" requested should be declined. The forms also indicated that Peoples would consider the issuance of a policy with a Table B rating.

Mr. Carter pointed out, however, that because of the applicant's death, there was no one available to accept Peoples' counter offer for a rated policy without a waiver

of the premium provision. Mr. Carter also testified that no policies had been issued by Peoples.

On the cross examination of Mr. Carter, counsel for Mrs. Medairy read into the record a letter from Robert N. Price of Peoples to the State Insurance Commissioner's Office in regard to the Medairy matter, as follows:

" 'I am enclosing copies of the two applications for insurance executed by Paige T. Medairy on October 11, 1967, and a copy of the report of the medical examination which was completed on October 16, 1967, in connection with these two applications. I am also enclosing copies of the Build Chart and Blood Pressure Tables which are included in the Reinsurance Manual of the Lincoln National Life Insurance Company and which are used by this Company in its underwriting.

" 'The applicant stated that he was 45 years of age as of his last birthday, and the medical examiner reported that he was 5 feet 5 inches tall and weighed 170 pounds. In accordance with the enclosed Build Chart, this applicant was given ten debit points. The medical examiner further reported that the applicant's systolic blood pressure was 140 and that the diastolic pressure was 88. The enclosed Blood Pressure Table indicates that 25 debit points should be added for these pressures. When an applicant receives debit points for both his build and his blood pressure, this Company has a general practice of increasing the number of debit points to be added for the blood pressure. In this instance, the Company used 30 debit points for the blood pressure rather than 25 as shown in the chart.

" 'The total debit points for this applicant were 140, and when such points fall between 135 and 150, this Company will consider the

issuance of a policy with a Table B rating. As the insured died on the day following his physical examination, the Company has not actually issued a policy because the applicant was not alive to accept the Company's counteroffer.

" 'Please contact me if I may supply you with any further information concerning this matter.' "

At the close of all the testimony, Peoples renewed its motion for a directed verdict, which the trial court declined. After the trial court's instructions were given, with the various exceptions taken by Peoples, and the arguments of counsel for the parties, the jury found a verdict for the plaintiff for $15,000. From the judgment absolute entered on this judgment, Peoples filed a timely appeal.

We are of the opinion that the lower court erred in declining to grant the motions for a directed verdict in favor of Peoples and the judgment will be reversed.

This Court in *Simpson v. Prudential Insurance Company of America*, 227 Md. 393, 177 A. 2d 417 (1962) has enunciated the law applicable to the present case. In *Simpson*, the application for life insurance was made on August 23, 1958, when the applicant filled out Part 1 of the application. A "conditional receipt" was given for the premium paid, which was similar to the receipt given in the present case. The *Simpson* receipt provided that if Parts 1 and 2 were completed and such other information as the Company might require "are received by the Company * * * and if the Company after receipt thereof determines to its satisfaction that the proposed insured was insurable * * *" etc. The applicant's medical examination was satisfactory except for a "trace" of sugar in the urine. The application form was forwarded to the Company in regular course. On September 8, 1958, the applicant was killed in an automobile accident and on September 19 a representative of the Company visited the widow and advised her that her husband had not

passed the physical examination. The agent tendered back the premium and denied any other liability on behalf of the Company. No policy on the decedent's life had been issued. The widow declined to accept the return of premium and sued Prudential for the amount of insurance for which application had been made. The trial court in *Simpson* directed a verdict in favor of Prudential on the ground that the agent had no power to bind the company to any immediate coverage as the plaintiff had stated the agent had represented was in effect at the time the original premium was paid. On appeal, the Court agreed that the agent lacked power to bind the Company to immediate coverage contrary to the terms of the receipt, but reversed and remanded the case so that the trial court could consider the question of insurability based upon an objective test which had not been considered in the lower court.

Chief Judge Brune, after a comprehensive review of the general law, stated, for the Court:

> "We think that the clause [in the receipt] means that the applicant must meet an objective standard of insurability, and that this standard is the company's own standard for the plan, the amount and the benefits applied for, and at the rate applied for. Honest satisfaction is the standard usually applied under contracts calling for the satisfaction of a party, in the absence of some clear indication to the contrary. See 5, Williston, *Contracts* (3rd ed.), §§ 675A, 675B; 3A Corbin, *Contracts*, §§ 644, 645; Restatement, *Contracts*, § 265. Somewhat by analogy, we think that in life insurance 'satisfaction' premium receipts an objective standard of satisfaction to comply with a condition should be applied, if such would be its fair meaning to an ordinary person not versed in the niceties of life insurance to whom such a receipt might be offered. Cf. the *Gaunt* case and see Comment,

*supra,* 44 Yale L.J. at 1227; Carnahan, *op. cit. supra,* at 222. We think that at least an ambiguity is presented and that in accordance with the established rule it should be resolved against the party whose language it is—that is, against the insurance company. *Pennsylvania Thresherman and Farmers' Mutual Casualty Ins. Co. v. Shirer,* 224 Md. 530, 168 A. 2d 525.

"The burden is, of course, on the plaintiff to show that the proposed insured met the objective test of insurability. The evidence does not make it clear whether he did or did not do so. The presence of a 'trace' of sugar in the urine does not seem conclusive, and it would appear from the application form that the company did not think it so. Evidence of insurability of the applicant according to the general standards of the industry would, we think, be sufficient to establish a *prima facie* case for the plaintiff. This the defendant might rebut by proof of its own objective standard (if different), or by evidence to show that the applicant did not meet this standard (whether the same as the general standard or different from it), or by evidence to support both of these contentions. Cf. *Wolfskill v. American Union Life Ins. Co., supra;* 5 Williston, *op. cit. supra,* § 674; 3A Corbin, *op. cit. supra,* § 749." (227 Md. at 406, 177 A. 2d at 425)

See *Cliborn v. The Lincoln National Life Ins. Co.,* 332 F. 2d 645 (CA 10, 1964), *Taylor v. New York Life Ins. Co.,* 324 F. 2d 768, (CA 10, 1963), *Vargas v. Pacific National Life Assurance Co.,* 79 N. M. 152, 441 P. 2d 50 (1968), *Adolf v. Union National Life Ins. Co.,* 170 Neb. 38, 101 N.W.2d 504 (1960). See also Sharer, *Enforceability of Temporary Binders Issued by Life Insurance Companies,* 22 Md. L. Rev. 230, 232 (1962).

In the present case, the issue of insurability was con-

sidered in the trial court but the plaintiff, in our opinion, failed to meet the burden of proof which rested upon her to show that the proposed insured met the objective test of insurability. Doctor Boyer clearly stated on direct examination that all he did for Peoples was to "state the facts on the medical examination" and that the "insurance company itself, the medical department, reviews any abnormal findings and then using their tables, actuarial mortality tables and so on, then they draw their own conclusions." He stated on cross-examination that he was not employed by Peoples "to determine insurability," knew that there was quite "a difference between clinical medicine and insurance medicine" and finally that he did not "pretend to be an expert on the standards of the industry for insurability." He stated, "That is a special field."

In short, Doctor Boyer did not purport to testify, and indicated that he was not qualified to testify, in regard to the insurability of the proposed insured on an objective basis as determined by Peoples "under its risks, limits and standards."

Nor, in our opinion, is the testimony of Mrs. Medairy sufficient to raise a jury question in regard to the insurability of her deceased husband on an objective basis as determined by Peoples under its rules, limits and standards. She did not purport to qualify as an expert witness in any regard. Her testimony in regard to seeing a paper with the words "issued" on it is not sufficient to raise a jury issue inasmuch as her somewhat conflicting account, already set forth, stated that Mr. Purkey said, "he couldn't tell me anything" and then stated in answer to the question, "Did he say anything about a policy of insurance with respect to * * * the word 'issued' " — "*No*, that is what I asked him, if it was issued and he *said it was*, but I mean my husband died in the meantime." * * * "I had never received any other policy." She freely admitted that at the same interview, she was tendered a check for a return of the premium and that she decided not to accept it and "gave him the check

back." On cross-examination, Mrs. Medairy in answer to a question, "But he [Mr. Purkey] didn't at any time tell you there was any policy?", replied "No, he didn't say, but there was a paper; he had a paper with him that I saw my husband's name on it."

It was stipulated that no policies were issued and the fact that Mr. Purkey tendered a Peoples' check for a return of the premium paid must necessarily have indicated to Mrs. Medairy that no policy had been issued and none would be issued. It will be noted that she does not categorically say that the paper with the word "issued" on it was a policy. We note that in Part 1 of the application for the $5,000.00 policy, there is a stamp in capital letters in the space (33) designated "For Home Office Endorsement Only", *"ISSUED* WITHOUT EXTENDED INSURANCE." (Emphasis supplied.) Under this stamp appears, "#5c. Waiver of Premium not granted. #3. Premium of $20.05 (vs. the original premium of $18.25) payable monthly." It may well be that this is the "paper" Mrs. Medairy saw, but it is clear that this was not a policy and, indeed, the stipulation and the uncontradicted evidence establishes that no policy was ever issued.

Not only did the plaintiff fail to meet her burden of proving that her deceased husband had met the objective test of insurability, but the evidence of Peoples shows affirmatively that he did not meet the test. The facts have already been stated and need not be repeated. There is no suggestion that the tests applied are not objective tests and the testimony was uncontradicted that they are generally used in the life insurance industry. There is also no testimony indicating that Peoples did not apply the tests objectively. The evidence is to the contrary.

*Judgment reversed, the appellee to pay the costs.*