779 A.2d 1061

**Curtiss B. MITCHELL**

v.

**AARP LIFE INSURANCE PROGRAM, NEW YORK LIFE INSURANCE CO.**

**No. 968, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 4, 2001.

Curtiss B. Mitchell, Forestville, for appellant.

Stefan A. Hagerup (Adkin, Gump, Strauss, Hauer & Feld, L.L.P., on the brief), Washington, DC, for appellee.

Argued before HOLLANDER, SONNER and ADKINS, JJ.

HOLLANDER, Judge.

In this case, we must determine whether Curtiss B. Mitchell, appellant, is the beneficiary of a valid contract of life insurance issued by the "AARP Life Insurance Program, New York Life Insurance Company" ("New York Life"),[1] appellee. On September 17, 1999, after New York Life refused to pay appellant the death benefit of $15,000 allegedly due under the life insurance policy that he procured for his late father, George Mitchell,[2] appellant filed suit in the Circuit Court for

---

1. Appellant sued "AARP Life Insurance Program, New York Life Insurance Company" but, according to appellee, "New York Life is the underwriter of various life insurance policies offered through a trust established by the American Association of Retired Persons (AARP) to provide life insurance to AARP members." Appellee states that "New York Life was the only defendant in the lower court proceeding, and is the only appellee for purposes of this appeal."

2. In view of the common surnames of Curtiss and George Mitchell, we shall refer to George Mitchell by his first name, and to Curtiss Mitchell by his last name.

Montgomery County. Appellee subsequently moved for summary judgment on January 31, 2000, claiming that no life insurance coverage existed when George died, and therefore appellant was not entitled to the insurance proceeds. The trial court granted summary judgment to New York Life on March 28, 2000. On April 10, 2000, appellant filed a motion to alter or amend, which was denied on May 22, 2000.

Appellant, who is *pro se* here, as he was below, presents two questions for our consideration. We have combined and rephrased them as follows:

Did the trial court err in granting appellee's motion for summary judgment?

For the reasons that follow, we shall affirm.

## FACTUAL BACKGROUND[3]

George, appellant's father, was born on June 5, 1926. On February 12, 1999, appellant obtained a Durable Power of Attorney over the affairs of his seventy-three year old ailing father, who was then hospitalized due to his failing health. Over the next several days, appellant contacted several life insurance companies in an unsuccessful attempt to obtain life insurance for his father.

---

3. We note that the record extract does not include the docket entries, the motion for summary judgment, or the opposition to summary judgment. Although appellee prepared an appendix, it did not include these documents.

Maryland Rule 8–501(c) states:
The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal. It shall include the judgment appealed from; the opinion or jury instructions of the trial court, if any; ... and such other parts of the record as are designated by the parties ...

To be sure, it is not our duty to search the record for pertinent information omitted from the record extract. *HEK Platforms and Hoists, Inc. v. Nationsbank*, 134 Md.App. 90, 98, 759 A.2d 293 (2000); *Miller v. Bosley*, 113 Md.App. 381, 391, 688 A.2d 45 (1997). In the exercise of our discretion, however, we shall not dismiss the appeal.

According to appellant, the "AARP New York Life Insurance Program had come to [his] attention during one of his visits with his father through a piece of their promotional literature which advertised prompt insurance coverage after the applicant had met a simple three step process...." Mitchell noted that the program was targeted for seniors, and was "very alluring." Mitchell asserts in his brief that "[e]nrollment and coverage was advertised as almost instantaneous after completion of [the] three step process." Because appellee's life insurance plan seemed "very practical and commonsensical" and was "designed for the benefit of seniors, [with] a very low rejection rate ...," appellant and his father "desired immediate coverage...." On behalf of his father, appellant contacted New York Life by telephone on February 28, 1999, to obtain assistance with the application form, titled "Request for Group Insurance."

Appellant alleged that he spoke with an agent of appellee about "expeditiously processing a policy of life insurance on his ailing father." He informed appellee's customer service representative that he was ready to complete the application "right then," but needed assistance with the form. According to Mitchell, the insurer's agent helped him with the application, but appellant was unable to identify the particular person with whom he spoke.

The insurance application form contains a section labeled "Coverage Amount Requested." Appellant initially sought $25,000 in coverage, the maximum amount offered. The "insurer's agent" advised him, however, that the age of his father precluded George from obtaining life insurance in that amount. As a result, appellant selected coverage of $15,000, the highest coverage available to George, based on George's age. Appellant named himself as the sole beneficiary of the requested policy.

Section B of the Application is titled "Payment Options," and contains two options for payment. "Option 1," titled "Automatic Premium Payment," authorizes monthly or quarterly withdrawals from a bank account. "Option 2," titled

"Periodic Premium Billing," contains two more choices. In one, the applicant seeks to be billed, while the other indicates that payment is enclosed. Appellant selected Option 2 and checked the box that reads: "So coverage can take effect as soon as possible, I enclose a check for my first payment in the amount of ____." In the blank, the application contains the handwritten amount of $151.80.

Section D is titled "Statement of Health." It asks the applicant if he or she has had "treatment for or consulted a physician about ... emphysema...." On the form, the word "emphysema" is circled. Appellant also checked "yes" to a question asking if the applicant had been admitted to a hospital in the past two years, adding that George suffered from "Chronic Obstructive Lung Disease & Tracheobronchitis," for which he had "nebulizer treatments, intravenous fluids & antibiotics."

Section E of the Application contains the following pre-printed statement:

> I understand that insurance will be *effective on the date of the certificate,* provided my premium is received during my lifetime and within 31 days of such Insurance Date. *I understand that premium payment for insurance does not mean there is any coverage in force before the effective date as specified by New York Life,* and that benefits may be denied during the first two years if material facts have been misstated here. I represent that I am an AARP member, and that, to the best of my knowledge and belief, the information on this request is true and complete.

(Emphasis added). Appellant signed the application as follows: "George C. Mitchell/Curtiss Mitchell P.O.A.," and dated it "2/20/99."

At his deposition on January 17, 2000, appellant said he believed the application constituted the "Certificate" referred to in Section E of the application. He explained that he "filled it out, sent [his] money ... and no one told [him] that this was not a certificate." He "point[ed]" to a number on the application, "5189624," to support his assertion. Appellant also indi-

cated at his deposition that the text of the application provided that the insurance would be effective "[o]n the date of the certificate." At the summary judgment hearing, however, Mitchell acknowledged that he never received a certificate from appellee.

Appellant claimed that, after completing the application, he asked appellee's customer service representative what he should do to assure immediate life insurance coverage for George. Mitchell contends that appellee's agent advised him to mail the completed application, along with a power of attorney and the premium payment, to appellee's corporate office. Accordingly, Mitchell mailed the application, a copy of the power of attorney, and a check dated March 4, 1999, in the amount of $151.80, in payment of the first premium. It is undisputed that New York Life received the documents on March 9, 1999; the application is stamped "Mar 09 1999." Moreover, appellee deposited appellant's check on that date.

George died the next day, March 10, 1999, at approximately 6:30 a.m. At about 8:00 a.m., appellant contacted New York Life to advise of his father's death. At his deposition, appellant said that he "never asked for the $150,000 death benefit."

On March 11, 1999, appellant again contacted New York Life. He was informed that the application had not been processed or reviewed prior to George's death, and therefore the policy was not in effect at the time of George's demise. Several days later, appellee returned the premium payment of $151.80 to appellant, with a letter advising that appellee had not approved the insurance application prior to George's death, and thus appellant was not entitled to the death benefit under the policy.

In support of its motion for summary judgment, appellee submitted several documents, including: an affidavit from Daniel J. Rice, the Director of Underwriting for New York Life's AARP Operations, located in Tampa, Florida; a copy of the power of attorney submitted by Mitchell; excerpts from appellant's deposition; a copy of the insurance application completed by Mitchell; and an excerpt from New York Life's

Underwriting Guidelines. Rice averred in his affidavit that the Underwriting Department had not reviewed George's application by the time he died, nor had New York Life issued a conditional receipt or a premium receipt to George. Rice stated that, as a result, appellee did not approve coverage for George, and no insurance certificate had been issued.

Appellant asserted in his opposition to the summary judgment motion that New York Life's brochure advertised an easy application process that would permit coverage at the "earliest possible date." Moreover, he argued that, in his conversation with New York Life's agent, "the terms and conditions for a policy of Life Insurance on the beneficiary's ailing father's life were set out and mutually agreed upon, and those representations merged with the brochure's representations to form a binding temporary contract." Appellant also claimed that appellee's agent advised him that if he completed "the Enrollment Form, executed a Durable Power of Attorney, and made out a check for the first premium payment in the sum of $151.80, and mailed the documents to New York Life, he would have a contract for preliminary and temporary insurance coverage for his father." Accordingly, appellant followed the instructions, and the first premium payment of $151.80 was deposited by New York Life on March 9, 1999, one day prior to George's death.

Although appellant did not include an affidavit with his opposition, he signed it under oath. In further support of appellant's opposition, he submitted the New York Life brochure, his check for the first premium payment, and the first page of his letter of June 8, 1999, to A.J. Goergen, a corporate vice president of New York Life, in which appellant described the events that took place. *See* Md. Rule 2–501(b).

On March 28, 2000, the court held a motion hearing. In granting summary judgment to appellee, the court stated:

> It is [appellee's] position in this case that summary judgment is appropriate to be granted by the Court for really three reasons, the first being that no insurance coverage existed at the time of George Mitchell's death.

It is the position of [appellee] that the application was merely an offer and that coverage would not take effect until the [appellee] accepted the offer and that the [appellee] did not have the opportunity to accept the offer because of the unfortunate timing of [appellant's father's] death being within a day of the materials being received by New York Life.

[Appellee] also argues that there is no situation of temporary insurance coverage because [appellant's father] did not meet any objective standard for insurability, and third, that even if he had met any objective standard for insurability, his application would have been rejected because he failed to meet three subjective requirements of [appellee].

This is all spelled out really in the paperwork that has been very well prepared by both sides in the case and is very complete.

It is [appellant's] position that the coverage really took effect when the [appellee] received the application based on the language of the brochure, which he felt was an offer to provide immediate life insurance, and that acceptance of the offer was completed by the mere receipt of the application and the check, and he bases his position on statements that he alleges were made by an agent of [appellee] during a series of phone conversations.

I have had an opportunity to review all of the citations which have been submitted by both sides in the case, and I cannot really distinguish this case from the case of *Heideman [v.] Northwestern National Life Insurance Company,* [546 N.W.2d 760 (Minn.Ct.App.1996)], which clearly indicates that the brochure is viewed as a solicitation for offers.

This particular brochure said, "Your coverage will take effect on the date shown on your certificate of insurance."

Therefore, I think it is clear that a certificate had to be issued by New York Life for them to have formally accepted the risk of this insurance.

The case of *Heideman's* language in the brochure is nearly identical to what is in this case, which has been

interpreted by many Maryland court decisions of the Court of Appeals and the Court of Special Appeals to support the position of [appellee].

So I am satisfied that it is appropriate to grant summary judgment in this case in favor of [appellee].

We shall include additional facts in our discussion.

## STANDARD OF REVIEW

Maryland Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see Okwa v. Harper*, 360 Md. 161, 178, 757 A.2d 118 (2000); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993). Similarly, in reviewing a grant of summary judgment, we must determine "whether a genuine dispute of material fact exists and then whether the movant is entitled to summary judgment as a matter of law." *Williams v. Mayor of Baltimore*, 359 Md. 101, 113, 753 A.2d 41 (2000); *see Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219 (1994).

When the movant has provided a sufficient basis for summary judgment, the party opposing the motion must "produce sufficient evidence" to show that there is a genuine dispute of fact, "which is sufficiently material to be tried." *Williams*, 359 Md. at 115, 753 A.2d 41; *see Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Berringer v. Steele*, 133 Md.App. 442, 470, 758 A.2d 574 (2000). A material fact is one that will "affect the outcome of the case," depending upon how the factfinder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *see Faith v. Keefer*, 127 Md.App. 706, 734, 736 A.2d 422, *cert. denied*, 357 Md. 191, 742 A.2d 521 (1999). All genuine factual disputes, and inferences reasonably drawn from the facts, are resolved in favor of the non-

moving party. *Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 94, 756 A.2d 963 (2000); *Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 345, 658 A.2d 675 (1995); *Green v. Brooks,* 125 Md.App. 349, 365, 725 A.2d 596 (1999). Moreover, in resolving the motion, the trial court may not determine the credibility of witnesses. *Thacker v. City of Hyattsville,* 135 Md.App. 268, 286, 762 A.2d 172 (2000). But, mere general allegations or conclusory assertions of disputed fact will not suffice. *Beatty,* 330 Md. at 738, 625 A.2d 1005.

Appellee included an affidavit with its motion for summary judgment. Appellant filed his opposition with an oath, but he did not include a countervailing affidavit. Maryland Rule 2–501(b) provides that the response to a summary judgment motion must "identify with particularity the material facts that are disputed." Further, the rule requires that when a motion is supported by an affidavit, the opposing party "shall support the response by an affidavit or other written statement under oath." *Id.; see Imbraguglio v. Great Atlantic & Pacific Tea Co., Inc.,* 358 Md. 194, 203–04, 747 A.2d 662 (2000) (recognizing that attachment of documents in a summary judgment proceeding, without affidavit, is not proper); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship,* 109 Md.App. 217, 263–64, 674 A.2d 106 (1996) (recognizing that a party opposing summary judgment must present admissible evidence of a factual dispute), *aff'd,* 343 Md. 334, 681 A.2d 70 (1996). Appellee did not challenge the sufficiency of appellant's oath or appellant's failure to submit an affidavit.

 As we observed, if there are no genuine disputes of material fact, then the reviewing court must determine if the trial court "reached the correct legal result." *Crews v. Hollenbach,* 126 Md.App. 609, 625, 730 A.2d 742 (1999), *aff'd,* 358 Md. 627, 751 A.2d 481 (2000); *see Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996); *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 42–43, 656 A.2d 307 (1995); *Beatty,* 330 Md. at 737, 625 A.2d 1005. In our review, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court."

*Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998). Appellate courts will generally uphold a grant of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see also Gross v. Sussex, Inc.,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co., Inc.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## DISCUSSION

Appellant contends that the trier of fact should have decided whether a binding contract of life insurance was formed based on appellee's promotional literature, "coupled" with the "telephone colloquy of February 20, 1999," between appellant and an agent of New York Life. According to appellant, his telephone conversation with an unidentified representative of New York Life, who assisted him with completion of the application, "had the [e]ffect of modifying and reforming the promotional literature and making a binding bilateral contract between the parties." Moreover, he observes that the promotional literature "said nothing about [appellee's] policy . . . of not accepting applications by phone, and was silent about the condition precedent of the enrollment application approved by their underwriter for the insurance coverage to take effect." Thus, appellant maintains that, "as the bargained exchange" for returning the completed enrollment form, executing the power of attorney, and mailing the first premium payment to New York Life, appellee was obligated to provide immediate insurance coverage for his father, as the "promised consideration." Appellant states: "The alleged contract between the parties was a . . . contract, its [sic] the fulcrum of this case, and should have been the primary focus of the trial court, steering its inquiry." Mitchell also claims the trier of fact should have determined whether appellee provided interim life insurance while George's application for insurance was pending.

Appellee counters that no insurance coverage existed, because New York Life "had neither processed nor reviewed

George Mitchell's enrollment application...." Indeed, appellee observes that its policies and procedures do not permit applications to be processed and accepted by telephone. Therefore, appellee asserts that New York Life never accepted the risk of coverage. In addition, appellee contends that appellant "failed to meet his burden of proof to show that his father met New York Life's objective standard of insurability."

Because the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts, we begin our analysis with a review of basic principles of contract law. *See Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 129 Md.App. 455, 467, 742 A.2d 79 (1999). A contract has been defined as " 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Kiley v. First Nat'l Bank of Md.*, 102 Md.App. 317, 333, 649 A.2d 1145 (1994) (quoting Richard A. Lord, 1 Williston on Contracts, § 1:1, at 2–3 (4th ed.1990)), *cert. denied*, 338 Md. 116, 656 A.2d 772, *cert. denied*, 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995).

The interpretation of a written contract is generally a question of law for the court, subject to *de novo* review. *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250, 768 A.2d 620 (2001); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999). " 'In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions.' " *Bushey v. Northern Assurance Co. of America*, 362 Md. 626, 631, 766 A.2d 598 (2001) (quoting *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508–09, 667 A.2d 617 (1995)). We utilize the law of objective interpretation to ascertain the intent of the contracting parties, provided that intention does not violate an established principle of law. *B & P Enter. v. Overland Equip. Co.*, 133 Md.App. 583, 604, 758 A.2d 1026 (2000); *Ragin v. Porter Hayden ·Co.*, 133 Md.App. 116, 135, 754 A.2d 503 (2000). When the language of a contract "is unambiguous, a court

shall give effect to its plain meaning and there is no need for further construction by the court." *Wells,* 363 Md. at 251, 768 A.2d 620; *see Painewebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001). Moreover, " '[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " *Labor Ready, Inc. v. Abis,* 137 Md.App. 116, 128, 767 A.2d 936 (2001) (citation omitted).

 The question of formation of a contract is central to this case. "A contract is formed when an unrevoked offer made by one person is accepted by another." *Prince George's County v. Silverman,* 58 Md.App. 41, 57, 472 A.2d 104 (1984). An essential element with respect to the formation of a contract is " 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.' " *Safeway Stores, Inc. v. Altman,* 296 Md. 486, 489, 463 A.2d 829 (1983) (citation omitted); *see Kiley,* 102 Md.App. at 333, 649 A.2d 1145. Thus, as with other contracts, the validity of an insurance contract depends upon the "two prerequisites of mutual assent ... namely, an offer and an acceptance." 3 Eric M. Holmes, Holmes's Appleman on Insurance 2D, § 11.1, at 93 (1998) ("Appleman").

 An "application for insurance standing alone does not constitute a contract upon which judgment can be recovered. It is merely an offer or request for insurance which may be either accepted or rejected by the insurer.... The offer must be unconditionally accepted for the contract of insurance to come into force." Appleman, § 11.1, at 93–94. As a "general rule," then, there is "no binding contract of insurance," even if the applicant makes a "contemporaneous payment" of the initial premium when submitting an insurance application, unless "the insurer manifests its acceptance." Appleman, § 11.1, at 95; *see also* Appleman, § 10.1, at 1 (acknowledging that a life insurance application is merely an offer to contract for life insurance, and that in order to create a binding contract of insurance, an insurer must accept the

offer); 1 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3D ("Couch") (1997) § 11:1, at 11–2 to 11–3; § 11:3, at 11–9 to 11–10; 43 Am.Jur. 2D *Insurance* § 201, at 283 (1982) ("Until the application is accepted, no contractual relationship exists between an applicant for insurance and the insurance company").

"[A]cceptance occurs when the insurer agrees to accept the application and to issue the policy," provided there are no condition precedents "to the completion of the contract agreed upon." Appleman, § 11.2, at 106. To be sure, "[a]cts and conduct of an insurance company may be sufficient to establish the acceptance. . . ." *Id.*, § 11.2, at 106.

It is also salient that, in the absence of an applicable statute, an insurer ordinarily has "no duty to write insurance for any particular applicant." *Id.*, § 11.1, at 91–92. To the contrary, an insurance company generally is entitled to determine the risks it considers profitable to insure. *Insurance Comm'r of Md. v. Allstate Ins. Co.*, 268 Md. 428, 440, 302 A.2d 200 (1973); *American Casualty Co. v. Ricas*, 179 Md. 627, 634, 22 A.2d 484 (1941). Put another way, " 'it is purely voluntary on the part of the company as to whom it will insure. . . . The insurer is. at liberty to choose its own risks and may accept or reject applicants as it sees fit.' " *Edelstein v. Nationwide Mut. Ins. Co.*, 252 Md. 455, 462, 250 A.2d 241 (1969) (citation omitted).

As we noted, "[t]here must be an actual acceptance by the insurer before it will be liable upon the risk." Appleman, § 11.2, at 106. The question here is whether appellant made a valid offer on behalf of his father that was accepted by appellee.

Appellant argues, *inter alia*, that a valid life insurance contract was created based on all of the circumstances, including appellee's brochure, its deposit of the premium payment prior to George's death, and the representations of an unnamed New York life representative on February 20, 1999. Appleman recognizes that, when an insurer "engages in

the mass solicitation of business by mail," it is not uncommon for the "average person [to] believe that his or her response by sending the application and premium would be sufficient to consummate the contract." Appleman, § 11.1, at 94–95. Yet, Appleman also asserts that "the insurer's physical acceptance of the submitted applica[tion] does not create the binding contract of insurance where the application and accompanying literature specifies that acceptance can only be made upon an investigation and determination of the applicant's insurability." *Id.* at 95. As the Court of Appeals recognized in *Simpson v. Prudential Ins. Co.*, 227 Md. 393, 400, 177 A.2d 417 (1962), "a life insurance company obviously has a sound business reason for wishing to be cautious before it fully commits itself by actually issuing a policy which is not readily cancellable." To protect against what might be perceived as an automatic acceptance, however, "the insurer must use clear and unequivocal language to demonstrate its intent to only provide coverage upon the satisfaction of various conditions pending its investigation of the application." Appleman, § 11.1, at 95.

In this case, appellant signed the application on behalf of his father, who was quite ill at the time. No information was presented below as to what George understood with respect to the application, as he did not complete or sign it; appellant did that for him, using his power of attorney. As the person executing the application, appellant was "legally obligated to read it before executing it." *Benjamin v. Erk*, 138 Md.App. 459, 481, 771 A.2d 1106 (2001). Indeed, persons who seek to obtain insurance have "a duty to read what they sign, and their failure to do so will not relieve or allow them to avoid their contract." Appleman, § 11.13, at 137. Similarly, a contract signatory is " 'presumed to know the contents, signs at his peril, suffers the consequences of his negligence, and is estopped to deny his obligation under the contract.' " *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 629, 726 A.2d 818 (1999) (citation omitted). The application signed by appellant and appellee's promotional literature adequately advised appellant that submission of an application with the initial premium would not guarantee coverage.

Appellant seems to overlook that the application that he executed clearly stated: "I understand that insurance will be *effective on the date of the certificate,* provided my premium is received during my lifetime and within 31 days of such Insurance Date. I *understand that premium payment for insurance does not mean there is any coverage in force before the effective date as specified by New York Life."* (Emphasis added). Additionally, as we observed, appellant checked the box indicating that he enclosed the first premium payment. That box stated: "So coverage can take effect as soon as possible, I enclose a check for my first payment in the amount of $ _____." The plain import of that language served to alert an applicant that coverage is not effective immediately, merely because payment is enclosed. Rather, enclosure of payment merely *expedites* the matter of a decision by the insurer as to coverage.

Nor does the promotional literature on which appellant relies support his contention that a contract of insurance was effective immediately. It stated:

**Certificate of Insurance—with Up to 30 Days to Review**

*Once you are approved, you will be sent a personalized Certificate* of Insurance summarizing your benefits . . .

*Your coverage will take effect on the date shown on your Certificate*—normally about seven days after approval of your Enrollment Form—provided premiums are paid when due . . .

(Emphasis added). This language is reiterated in the "Question and Answer" section of appellee's brochure, which said:

Q. When will my coverage take effect?

A. *Your coverage will take effect on the date shown on your Certificate of Insurance (normally, about seven days after we approve your Enrollment Form),* provided premiums are paid when due.

(Emphasis added).

Appellant does not contend that appellee acted fraudulently, or that he acted under duress or otherwise lacked the capacity to read and understand whatever documents he executed or

reviewed. In the absence of " 'fraud, duress, or mutual mistake, one who has the capacity to understand a written document who reads and signs it, . . . is bound by his signature to all of its terms.' " *Golub v. Cohen*, 138 Md.App. 508, 517, 772 A.2d 880 (2001) (quoting *Binder v. Benson*, 225 Md. 456, 461, 171 A.2d 248 (1961)); *see Eureka–Maryland Assurance Corp. v. Samuel*, 191 Md. 603, 609, 62 A.2d 622 (1948) (recognizing that "the language in the [life insurance] application was sufficient to put [applicant] on notice that [the insurance agent] alone could not make the policy effective without payment of the first premium or change the application from an annual basis to a quarterly basis"). Furthermore, "the mere fact of the applicant's signature, when able to read and write, has been held conclusive proof, in the absence of fraud, that the applicant did so read it." Appleman, § 11.13, at 141.

Rice said in his affidavit that when appellant notified New York Life that his father had died, appellee's Underwriting Department had not yet had an opportunity to review the application submitted on behalf of George; the insurance company only received the application one day prior to George's death. Accordingly, Rice averred that "no decision had been made regarding whether the decedent would be offered coverage, and an insurance certificate had not been issued." Rice also asserted in his affidavit that "New York Life's policies and procedures do not allow an applicant to obtain insurance coverage through the AARP program over the telephone prior to the application being reviewed by New York Life Personnel."

*Simpson, supra*, 227 Md. at 393, 177 A.2d 417, is instructive. There, an applicant for life insurance was killed in a motor vehicle accident shortly after he submitted his application and premium payment. The insurance company had already deposited the applicant's check, tendered by the applicant for the premium. Moreover, the insurance company's agent had given the applicant a "conditional receipt" issued by the insurance company upon payment of the first premium. After the insurer refused to pay the death benefit under the policy, the

decedent's wife sued the insurer, claiming it had contracted to issue the policy. The Court of Appeals construed both the application and the "conditional receipt." As the Court noted, the "crux of the case" concerned "whether the terms of the receipt obligated the defendant insurance company to insure the life" of the [decedent]. *Id.* at 399, 177 A.2d 417.

The applicant received the "conditional receipt" contemporaneous with his completion of the non-medical portion of the life insurance application on August 23, 1958, and his payment of the premium. At that time, the agent said: " 'When you give me the check for a payment on this insurance, you are covered. When I receive your check, you are covered as of then.' " *Id.* at 396, 177 A.2d 417 (citation omitted). The insurance company cashed the check the next day. *Id.* As part of the application process, a doctor examined the applicant on August 31, 1958, and completed the medical portion of the application at that time. The results of the medical examination showed a " 'trace' of sugar in the [applicant's] urine." *Id.* About a week later, the applicant was killed in a vehicular accident. Thereafter, on September 19, 1958, the insurance company notified the decedent's widow that the applicant did not pass the physical examination, no policy was ever issued, and the company was not obligated to pay a death benefit. It also tendered a refund of the premium. *Id.* The trial court directed a verdict for the insurance company, finding that the agent had no power to bind the company to "immediate coverage."

On appeal, the Court agreed with the trial court's decision as to the agent's lack of authority to bind the company. *Id.* at 398, 177 A.2d 417. It said: "The absence of such power was clearly set forth not only in the application, but in the receipt itself, upon which the plaintiff's claim must stand or fall." *Id.* at 398–99, 177 A.2d 417. Nevertheless, the Court reversed and remanded on other grounds.

The Court had "no difficulty" in finding that a contract was created based on the conditional receipt issued to the applicant upon his payment of the premium. *Id.* at 403, 177 A.2d 417.

In reaching that conclusion, the Court noted, *inter alia,* that the insurer did not contest the agent's authority to issue the conditional receipt or to bind the company to the terms contained in the receipt. *Id.* at 399, 177 A.2d 417. Nevertheless, as to the insurer's liability, the Court determined that its obligations at that juncture were governed by the terms of the conditional receipt. *Id.* at 399, 177 A.2d 417. The Court explained that "payment in advance of the premium constituted consideration for whatever obligations the company assumed under the terms of its receipt." *Id.* at 403, 177 A.2d 417. Based on those terms, the Court said: "Unless the standard of insurability [was] met [by the applicant,] the terms of the receipt . . . sets [sic] up a bar to recovery by the beneficiary." *Id.* at 405, 177 A.2d 417. The Court then proceeded to discuss insurability.

*Simpson* seems to suggest that an insurance company does not necessarily create a contract of life insurance merely by cashing a premium check before deciding whether to insure an applicant for life insurance. Moreover, the Court recognized the insurance company's legitimate interest in establishing standards of insurability and in investigating whether the applicant satisfies those standards. Although the Court determined that the insurance company was bound by the terms of the conditional receipt, that document did not necessarily obligate the company to pay the death benefit. As a result, the Court remanded for further proceedings with regard to whether the decedent met the standards of insurability.

In this case, unlike in *Simpson,* Mitchell did not receive a conditional, interim, or binding premium receipt from appellee. In general, such receipts provide either "immediate unconditional, temporary insurance," or insurance effective as of the date of either the applicant's medical examination or his payment, or insurance as of the date of application, if the applicant is later shown to be "a satisfactory insurable risk . . ." as of that date. *Simpson,* 227 Md. at 400, 177 A.2d 417. Consistent with the terms of New York Life's advisement on the application, a valid contract of life insurance was not created merely because appellee received the enrollment form

and the premium payment just prior to George's death. Rather, the terms of the application provided that coverage was subject to approval by appellee; George died before appellee had an opportunity to consider whether to approve or reject his application.

*Heideman v. Northwestern Nat'l Life Ins. Co.*, 546 N.W.2d 760 (Minn.Ct.App.1996), review denied, 1996 Minn. Lexis 377 (filed June 5, 1996), on which appellee and the trial court relied, is also generally consistent with the principles that we outlined above. There, an applicant completed a life insurance form entitled **"SPECIAL 'EASY ACCEPTANCE' OFFER TERM LIFE INSURANCE PLAN."** *Id.* at 762 (citation omitted). The promotional literature said:

"The MMA Group Insurance Program—is making an offer you won't want to miss . . . All this protection is available to you on a special, easy acceptance basis. This means NO long forms to complete . . . No complicated health questions to answer . . . [T]his offer is good for a limited time only, so don't delay."

*Id.* at 762–63. Additionally, the application form stated: "Acceptance into this Plan is easy as long as you are not already participating in the Plan and you can answer 'No' to the health question on the simplified application form." *Id.* at 763. The applicant mailed the form, along with the first premium payment, on October 24, 1994, and died a few days later. Unaware of the applicant's death, the insurance company approved the application, effective November 4, 1994, and issued a certificate of insurance to the already-deceased applicant. The insurance company subsequently denied the wife's claim under the policy.

The widow brought suit, claiming that a life insurance contract was created because the application constituted a unilateral offer by the insurance company that was accepted by the decedent when he submitted the application and premium. The Court of Appeals of Minnesota rejected the wife's position. It acknowledged the general rule that "an application for insurance is an offer requiring the acceptance of the

insurance company." *Id.* at 763. Moreover, the court was satisfied that the applicant knew that insurance company approval was required, because he signed the application, which contained the following statement:

"I understand and agree that no coverage shall take effect unless this application *is approved* by [the insurance company] and the first premium is paid during my lifetime.

I understand my coverage begins on the effective date *assigned by* [the insurance company]."

*Id.* (citation omitted).

Accordingly, the court concluded that the express language of the application foreclosed any assertion that the insurer was liable based on submission of the application, because the insurance company had not given its approval. The court stated: "Unless otherwise provided for, an application for insurance is an offer by the applicant that must be assented to by the insurer during the lifetime of the applicant for a valid contract for life insurance to exist. Here no contract for life insurance ever came into being. [The insurance company] did not agree to insure [the applicant] before his death." *Id.* at 764.

*Watts v. Life Ins. Co. of Ark.,* 30 Ark.App. 39, 782 S.W.2d 47 (1990), also provides guidance. In that case, an applicant for life insurance submitted an application on September 3, 1985, along with the first premium. The application stated:

"After the policy effective date, newly eligible persons may apply within 31 days after they become eligible, and individual insurance will become effective on the first day of the month next following the date the application is received. Eligible persons who do not apply either during the initial enrollment period or within 31 days after becoming eligible may thereafter apply, but *individual insurance shall not become effective until the first day of the month next following the date the application is approved by the Com-*

*pany after submission of satisfactory evidence of insurability.* [Emphasis added.]"

*Id.* at 48–49 (citation omitted).

Several days later, on September 18, 1985, the applicant died. Thereafter, the insurance company denied the beneficiary's death benefit under the policy, and returned the premium that had been submitted with the application. The beneficiary then filed suit, asserting that because the application did not specify the effective date, the applicant had a reasonable expectation that coverage would begin when the application was completed and the premium was submitted. The Court of Appeals of Arkansas disagreed, stating that "an applicant for insurance is afforded no coverage until the coverage becomes effective under the terms of the policy." *Id.* at 49. Moreover, it found that the terms of the policy were clear and unambiguous, with no provision for temporary coverage. Given the death of the applicant prior to the effective date of the policy, the court concluded that the applicant had no insurance coverage at the time of death. Accord *Wells v. United States Life Ins. Co.,* 119 Idaho 160, 804 P.2d 333 (1991) (concluding that, based on the language of the application, submission of application for life insurance, along with premium payment, did not create binding insurance policy on life of applicant, who disappeared 13 days later while in an airplane).

The out-of-state cases on which Mitchell relies are distinguishable from the facts in this case. For example, in *Brill v. Guardian Life Ins. Co. of Am.,* 142 N.J. 520, 666 A.2d 146 (1995), the decedent's widow recovered based on the insurance broker's negligence; she did not recover from the insurance company. The *Brill* court recognized that the broker breached his duty to the insured to advise him regarding the option for a conditional receipt policy, which would have provided prompt coverage.

Alternatively, we agree with New York Life that appellant presented no evidence to controvert appellee's evidence that George did not satisfy an objective standard of insurability.

We explain by returning to *Simpson*, 227 Md. 393, 177 A.2d 417.

Based on the premium receipt issued to the applicant in *Simpson*, the requested life insurance was to take effect at the time of the medical exam, if, under objective standards of insurability, the applicant was insurable at that time. *Id.* at 401, 177 A.2d 417. The Court stated that "[t]he burden is … on the plaintiff to show that the proposed insured met the objective test of insurability." *Id.* at 406, 177 A.2d 417. Because the evidence of a "trace of sugar in the urine" was not conclusive as to the insurability of the applicant, and the trial court never considered the issue, the Court determined that the plaintiff had established a *prima facie* case of insurability, and it remanded for further proceedings. *Id.*

*Peoples Life Ins. Co. v. Medairy*, 255 Md. 534, 258 A.2d 429 (1969), is also helpful. In that case, the applicant completed the first part of a life insurance application on October 11, 1967, tendered the first premium, and received a receipt. On October 16, 1967, the insurance company's doctor examined the applicant and completed the second part of the application relating to medical information. The following day, the applicant suffered a fatal heart attack. When the insurance company refused to forward the death benefit to the applicant's wife as beneficiary, the widow brought suit. After a jury found in favor of the beneficiary, the insurer appealed. The Court determined that the beneficiary "failed to meet the burden of proof which rested upon her to show that the proposed insured met the objective test of insurability," *id.* at 548, 258 A.2d 429, while the insurance company affirmatively showed the deceased's failure to meet the test. *Id.* at 549, 258 A.2d 429.

*Cannon v. Southland Life Ins. Co.*, 263 Md. 463, 283 A.2d 404 (1971), also provides guidance. There, a father sought disability, accident, and sickness insurance for his 16–year–old son. On May 23, 1969, an insurance agent assisted the child's parents in completing the application. Two days later, the child was injured in an accident. Because the insurance

company received a check dated May 26, 1969, for the first quarterly premium, it issued a conditional receipt. Nonetheless, upon further review of the application, the company rejected the application, because its minimum age of insurability was 25. The applicant and his mother then brought suit against the insurance company. They argued that the agent had advised that the insurance would be effective "immediately," *id.* at 465, and the agent knew the son's age. Moreover, they argued that because the company occasionally insured applicants as young as 20 years of age, it had waived the standard of not insuring persons under 25. The trial court rejected those contentions and the Court of Appeals affirmed. It determined that the claimants failed to meet the burden of establishing that the son met the standard of insurability. The Court explained:

Age is certainly . . . an objective standard as a condition of health. There is nothing to the argument that because [the insurance company] had insured and would insure selected risks as young as twenty that it had abandoned or waived its age requirements. The applicants were all younger than twenty and would not have qualified even if Southland had lowered the general minimum of twenty-five to twenty before they made application. Appellants failed to meet the burden of proof which rested upon them to show that the applicants met [the insurance company's] honest objective standard of insurability and [the insurance company] proved that they did not. The judgment below properly was in favor of Southland.

*Id.* at 470, 283 A.2d 404. Accord *Whitmire v. Colonial Life & Accident Ins. Co.,* 172 Ga.App. 651, 323 S.E.2d 843 (1984).

In the case *sub judice,* appellee submitted its Underwriting Guidelines as an exhibit to Rice's affidavit. The document provided, in pertinent part:

*Power of Attorney—*

● Must provide legal copy of the papers. Papers should have raised seal or stamp.

• Papers *must* specify that the guardian has the right to obtain *life* insurance.

• We will offer only Guaranteed Acceptance.

In his affidavit, Rice claimed that the Power of Attorney submitted by appellant did not meet appellee's Underwriting Guidelines. He said, in part:

New York Life's Underwriting Guidelines related to the AARP Program require that in cases where a power of attorney is attempting to obtain an insurable interest on the life of the principal, the power of attorney "[p]apers must specify that the guardian has the right to obtain *life* insurance." . . . Because the power of attorney document sent in by [applicant] did not specify that he had a right to obtain life insurance on behalf of his father, New York Life would have rejected the application on this basis.

■ We agree with Rice that the Power of Attorney submitted by appellant failed to indicate that he had a right to obtain life insurance for George. Rather, it stated only that appellant may "DO ONE OR MORE OF THE FOLLOWING: TO SELL, LEASE, GRANT, ENCUMBER, RELEASE OR OTHERWISE CONVEY ANY INTEREST IN MY REAL PROPERTY AND TO EXECUTE DEEDS AND ALL OTHER INSTRUMENTS ON MY BEHALF . . ."

Further, Rice's affidavit provided that appellee would have rejected the application due to George's medical condition. Rice said:

[T]he decedent's medical condition would have also resulted in his application being rejected by New York Life. The decedent's enrollment application stated that he was suffering from emphysema and "Chronic Obstructive Lung Disease and Tracheobronchitis, nebulizer treatments, and intravenous fluids and antibiotics [sic]." The decedent was also in the hospital at the time his application was completed. Moreover, the decedent failed to provide additional information requested in the enrollment application related to his medical condition under Section D of the enrollment application. As a result, the decedent's medical condition would

have been classified as an unacceptable risk, and his application would have been rejected on this basis.

George was at death's door when appellant submitted the application for life insurance. We cannot conceive of any life insurance company that would have issued a policy to George at that time. Undoubtedly, George's poor health explains why appellant never controverted Rice's affidavit as to the objective standard of insurability. Instead, appellant relied on his argument that his submission of the application and premium, appellee's deposit of the premium check, and the representations of appellee's agent combined to create a binding life insurance contract.

## CONCLUSION

We are amply satisfied that the trial court did not err in granting summary judgment in favor of appellee. By way of Rice's affidavit and exhibits, appellee satisfied its initial burden of "present[ing] the material facts necessary to obtain judgment and demonstrate that there is no dispute as to any of those facts." *Fearnow v. Chesapeake & Potomac Tel. Co.,* 104 Md.App. 1, 48–49, 655 A.2d 1 (1995), *rev'd in part on other grounds,* 342 Md. 363, 676 A.2d 65 (1996). The facts presented by appellee showed that appellee never accepted the risk of insuring George prior to his death, nor was George's insurability established.

Appellant's conclusory assertions were insufficient to overcome appellee's evidence. *See Jones v. Mid–Atlantic Funding Co.,* 362 Md. 661, 676, 766 A.2d 617 (2001) (party opposing summary judgment *"must* produce sufficient evidence to the trial court [showing] that a genuine dispute of a material fact exists."); *Danielewicz v. Arnold,* 137 Md.App. 601, 612–613, 769 A.2d 274 (2001) (stating that the nonmoving party *"must* submit evidence in which the [court] could reasonably find for" the nonmoving party)(emphasis added), *cert. denied,* 365 Md. 65, 775 A.2d 1216 (2001); *Maryland Cas. Co. v. Lorkovic,* 100 Md.App. 333, 354, 641 A.2d 924 (1994) (stating that the party opposing summary judgment must offer " 'evidence upon

which the [court] could reasonably find [in his favor]' ") (citation omitted). Because appellant failed to demonstrate, with "some precision," that a genuine dispute existed as to material fact, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**